4 E. CEDAR STREET
CHICAGO, ILLINOIS

LEASE AGREEMENT

Between

MAROL STATE, L.L.C.,
an Illinois limited liability company, as Landlord

And

EVERLANE INC., a Delaware corporation, as Tenant

**Exhibit 1**

#3104972v10

## LEASE AGREEMENT

THIS LEASE AGREEMENT ("Lease") is made as of the _____ day of October, 2019 ("Effective Date"), by and between **MAROL STATE L.L.C.**, an Illinois limited liability company ("Landlord"), and **EVERLANE, INC.**, a Delaware corporation ("Tenant").

## ARTICLE I
## BASIC LEASE PROVISIONS AND EXHIBITS

**Section 1.** **Basic Lease Provisions**

The descriptions, definitions, capitalized words and amounts set forth below shall be construed as set forth herein unless expressly modified by terms elsewhere in this Lease, including those Articles and/or Sections referred to in parentheses:

**Section 1.1** Building: The building located at the northeast corner of State and Cedar Streets, Chicago, Illinois, 60610, which includes the Premises, other leasable areas, basement and Common Areas (as hereinafter defined).

**Section 1.2** Premises (Section 2.1). Spaces Tenant C and Tenant D, 4 E. Cedar Street, Chicago, Illinois 60611, containing approximately 3,629 square feet on the ground floor. The number "4" in the address for the Premises is subject to the approval of the City of Chicago ("City"), and shall be changed if required by the City.

**Section 1.3** Base Rent Square Footage (Section 2.1): Approximately 4,243 square feet, comprised of 3,629 square feet, which is the square footage of the ground floor portion of the Premises, and 614 square feet, which is the approximate Tenant's share of the common corridor in the Building that serves all the leasable areas in the Building ("Common Corridor"). The Base Rent Square Footage shall be used to calculate the Base Rent. All other items of Rent shall be calculated using the gross useable area of the ground floor portion of the Premises (3,629 square feet), in proportion to the total useable square feet of each premises at the Building, comprising 6,921 square feet as shown on Exhibit "A".

**Section 1.4** Initial Term (Section 3.1): Ten (10) years, commencing on the Commencement Date, and ending on the last day of the tenth (10th) Lease Year (as defined in Section 3.2).

**Section 1.5** Options to Extend (Section 3.5): Two (2) options of five (5) years each. Each five (5) year period is an "Option Term," individually and collectively "Option Terms".

**Section 1.6** Commencement Date (Section 3.1): The earlier of (i) the day Tenant opens for business to the public, or (ii) September 1, 2020.

**Section 1.7** Expiration Date (Section 3.1): The last day of the tenth (10th) full Lease Year, unless the Lease is (i) extended pursuant to Section 3.5, in which case the Expiration Date shall be the last day of the applicable Option Term; or (ii) terminated by Tenant pursuant to Section 3.6, in which case the Expiration Date shall be the Early Termination Date (Section 3.6).

**Section 1.8**    Possession Date.  The Possession Date shall be the Effective Date.

**Section 1.9**    Permitted Use (Section 2.2):

**Section 1.10**    Base Rent (Article IV):  The Base Rent for the Initial Term and Option Terms will be the amounts set forth below, which are calculated based upon the Base Rent Square Footage (as defined in Section 1.3).

(i) Initial Term: Suite Tenant C

| PERIOD | ANNUAL BASE RENT | MONTHLY BASE RENT |
|---|---|---|
| Lease Years 1-5 | $492,325.00 ($235.00 psf) | $41,027.08 |
| Lease Years 6-10 | $541,557.50 ($258.50 psf) | $45,129.79 |

(ii) Initial Term:  Suite Tenant D

| PERIOD | ANNUAL BASE RENT | MONTHLY BASE RENT |
|---|---|---|
| Lease Years 1-5 | $451,080.00 ($210.00 psf) | $37,590.00 |
| Lease Years 6-10 | $496,188.00 ($231.00 psf) | $41,349.00 |

(iii) Initial Term:  Suites Tenant C and Tenant D

| PERIOD | ANNUAL BASE RENT | MONTHLY BASE RENT |
|---|---|---|
| Lease Years 1-5 | $943,405.00 | $78,617.08 |
| Lease Years 6-10 | $1,037,745.50 | $86,478.79 |

(iv)    Option Term:  Suite Tenant C

| PERIOD | ANNUAL BASE RENT | MONTHLY BASE RENT |
|---|---|---|
| Lease Years 11-15 | $595,713.25 ($284.35 psf) | $49,642.77 |
| Lease Years 16-20 | $655,295.05 ($312.79 psf) | $54,607.92 |

2

(v)     Option Term: Suite Tenant D

| **PERIOD** | **ANNUAL BASE RENT** | **MONTHLY BASE RENT** |
|---|---|---|
| Lease Years 11-15 | $545,806.80 ($254.10 psf) | $45,483.90 |
| Lease Years 16-20 | $600,387.48 ($279.51 psf) | $50,032.29 |

(vi)    Option Term: Suites Tenant C and Tenant D

| **PERIOD** | **ANNUAL BASE RENT** | **MONTHLY BASE RENT** |
|---|---|---|
| Lease Years 11-15 | $1,141,520.05 | $95,126.67 |
| Lease Years 6-10 | $1,255,682.53 | $104,640.21 |

**Section 1.11**   Additional Rent (Section 4.4).

**Section 1.12**   Rent.  Base Rent, Additional Rent and all other sums due from Tenant to Landlord hereunder.

**Section 1.13**   Trade Name.  Everlane.  Tenant may, upon not less than thirty (30) days prior written notice change such trade name to any other trade name(s) from time to time used by Tenant, its parent(s) affiliates or subsidiaries, provided that any change shall not violate any use restrictions set forth in Exhibit E, and any lease restriction then in effect at the Building.

**Section 1.14**   Notices (Section 26.9):

Tenant Notices:  2170 Folsom Street, San Francisco, California 94110

Landlord Notices:  Marol State L.L.C., c/o Ralph W. Marol, Manager, 81 Salem Lane, Evanston, Illinois 60203, with a copy to Barry Glazer, Robbins, Salomon & Patt, Ltd., 180 North LaSalle Street, Suite 3300, Chicago, Illinois 60601

**Section 1.15**   Brokers (Section 26.6)

Landlord's Broker:     Baum Realty Group

Tenant's Broker:       Jones Lang LaSalle

**Section 1.16**   Tenant's Share of Taxes: 52.43% of Taxes.  Tenant's Share of Expenses 52.43% of Expenses.

**Section 1.17**   Rent Payment: All rent shall be payable to Marol State L.L.C. Landlord shall provide Tenant with electronic transfer instructions.

3

**Section 1.18**  Landlord's Contribution to Tenant's Work (Section 6.5)

**Section 1.19**  Guarantor:  None.

**Section 1.20**  Security Deposit:  None.

**Section 1.21**  The following exhibits are attached hereto and made a part of this Lease:

| | |
|---|---|
| Exhibit A | Site Plan |
| Exhibit B | Rules and Regulations |
| Exhibit C | General Provisions for Tenant's Work |
| Exhibit D | Tenant Sign Criteria |
| Exhibit E | Use Restrictions |
| Exhibit F | Intentionally Deleted |
| Exhibit G | Form of Subordination, Non-Disturbance, and Attornment Agreement |
| Exhibit H | Basement Plan |
| Exhibit I | Intentionally Deleted |
| Exhibit J | Exhibit J Work |
| Exhibit K | Tenant's Signs |
| Exhibit L | Landlord's Lien Waiver |

**ARTICLE II**
**PREMISES; USE; COMMON AREA**

**Section 2.1**  **Premises**

A.  Landlord leases to Tenant, and Tenant rents from Landlord, the space in the Building identified as "State/Cedar Corner, Tenant "C" and "D" on the Site Plan attached hereto as Exhibit A (herein called the "Premises").  Tenant may not use the basement of the Building, except as provided in Section 2.4 below.

B.  The Premises are shown on the Site Plan.  The Site Plan is provided for informational purposes only, and shall not be deemed to be a warranty, representation or agreement by Landlord that the Premises, the Building and/or spaces will be exactly as indicated on said Site Plan.

C.  Prior to the Commencement Date, Tenant, at its sole cost, shall have the right to measure the Premises (as defined in Section 1.3) from the outside of exterior walls to the center of any demising walls.  If based upon such measurement the Premises should measure at least two percent (2%) more or less than the approximation set forth in Section 1.2, subject to the certification by Landlord's architect, an appropriate increase or decrease shall be made to the Base Rent (including any adjustment related to the calculation of Tenant's share of the Common Corridor), Tenant's Share of Taxes, Tenant's Share of Expenses, and any other items of Rent which are based upon square footage measurements and this Lease shall be amended accordingly, provided that for purposes of determining a change in such Rent, no adjustments in Rent shall be made for changes to the Basement Space.  Landlord shall have no right to relocate the Premises.

**Section 2.2    Use**

Tenant shall use, occupy, maintain and operate the Premises principally and primarily for the retail sale of apparel and footwear (individually and collectively, "Permitted Use"). Tenant may sell, on an incidental and non-exclusive basis, other merchandise, so long as all non-apparel and footwear are sold in a majority, of the Tenant's other stores and do not conflict with the restrictions described in Exhibit E and any Laws (as defined in Section 26.8). Notwithstanding anything to the contrary contained herein, Tenant may not use the Premises for any use that is in violation of Exhibit E, attached hereto and made a part hereof, or any exclusive uses granted by Landlord to other tenants at the Building. Tenant acknowledges that Landlord has previously granted to a tenant in the Building the exclusive right to display and sell (i) eyewear, eyewear accessories and eyewear ancillary items, and the performance of eye examinations, and (ii) luggage and travel goods; and Tenant shall not violate such exclusivities. The foregoing exclusivity restrictions shall not apply to the incidental display or sale and rental of eyewear ("Incidental Use") by Tenant or occupant of the Premises (i.e. no more than ten percent (10%) of the sales area of Tenant or occupant may be devoted to the display or sale and rental of eyewear). If Tenant violates the exclusivities or Incidental Use, Tenant shall immediately cease such activities and the Incidental Use, and terminate such activities and the Incidental Use upon written notice from Landlord. Tenant shall indemnify and hold Landlord harmless from and against all claims, damages and costs, including reasonable attorneys fees, arising from Tenant's violations of the exclusivity restrictions or Incidental Use.

**Section 2.3    Building and Common Area**

A.      "Common Area" shall mean all areas of the Building (excluding the interior of the Premises), leasable areas (each as identified on the Site Plan) and any other portion of the Building that is or is intended to be leased and is not made available for the common and joint use and benefit of the tenants or occupants of the Building) which are now or hereafter made available by Landlord, from time to time, for the common and joint use and benefit of Landlord, Tenant, Tenant's employees, agents, and invitees, and other tenants or occupants of the Building, including but not limited to: the common corridors; the Trash and Loading Yard described on Exhibit "A"; the basement if not occupied by any tenant or occupant; the elevator; staircases; signs that identify only the Building; perimeter walls; lighting facilities; sewer lines; electrical rooms; plumbing rooms; mechanical rooms; heating, ventilating and air conditioning systems and equipment serving the Building and not serving any leased or leasable area; water mains; mechanical equipment; and service areas. Certain portions of the Common Area are depicted on the Site Plan.

B.      The Building (other than the Premises) and the Common Area shall at all times be subject to the exclusive control and management of Landlord. So long as the Lease remains in full force and effect, Tenant and its employees, agents, contractors, business invitees, and customers shall have the nonexclusive right, in common with Landlord and all others to whom Landlord has granted or may hereafter grant rights, to use the Common Area subject to the rules and regulations and other terms set forth on Exhibit B attached hereto and made a part hereof, as such rules and regulations may be reasonably amended from time to time by Landlord. Tenant agrees to cause its officers, employees, agents, customers and invitees to abide by such rules and regulations. All rules and regulations must be reasonable, uniformly enforced and applied, and may not materially enlarge Tenant's obligations under the Lease or materially limit Tenant's rights and remedies

under the Lease, including (without limitation) Tenant's use of the Premises or the Common Areas. The Lease provisions shall control and supersede any contradictory or inconsistent provisions contained in the rules and regulations. Landlord shall provide reasonable advance notice of any modifications or additions to the rules and regulations.

C.      Without limiting the generality of the foregoing, Landlord has the right, in its management, control and operation of the Building and Common Area, to do and perform such acts in and to the Building and Common Area as Landlord determines to be reasonably advisable for the Building and the Common Area, including, but not limited to: obstructing or closing off all or any part of the Common Area for the purpose of maintenance, repair, construction, to prevent the acquisition of public rights therein or for other reasonable purposes; changing the area, level, location, arrangement or use of the Common Area, or any part thereof; making alterations thereof, additions thereto, subtractions therefrom, or rearrangements thereof; exclude, expand, change, modify, add to or subtract from (i) the size and dimensions of the leasable areas (Landlord and Tenant acknowledge that Tenant shall install a demising wall, in accordance with plans approved by Landlord and Tenant) and the Common Area, (ii) the identity and type of stores and tenants in the Building, (iii) the signs (pylon/monument and otherwise) installed or to be installed at the Building (other than the Premises); and (iv) the design or decorating of any portion of the Building (other than the Premises) or the Common Area.

D.      Landlord's rights under this Section may be performed so long as (a) access to, and the visibility of, the Premises are not unreasonably denied or materially obstructed, and (b) the business operated in the Premises by Tenant is not materially and adversely affected, and (c) such changes do not materially decrease the frontage of the Premises, materially detract from Tenant's signage, or materially and adversely affect the presentation of Tenant's exterior signage and storefront.

E.      Except as may be necessitated by repairs to the Building, or compliance with Laws, there shall be no alterations, structure, barrier or obstruction, including, without limitation, a kiosk, pushcart or mobile retail unit (whether temporary or permanent), on the sidewalk in front of or on the side of the Premises in any service corridor leading to the Premises, or in the Trash and Loading Yard (as defined in Exhibit B) (collectively, "Protected Area"). Nothing contained in this subsection E. shall restrict Landlord from complying with Laws.

F.      Landlord and Tenant hereby acknowledge and agree that, in connection with repairs or alterations, improvements and additions required to be performed by Landlord hereunder, Landlord may be required to install scaffolding or other barricades outside the Building in front of the Premises and Landlord shall be permitted to do so, subject to the following restrictions:

(i)      except in the event of an emergency or required by Laws, scaffolding and barricading shall not be placed in front of the Premises during the time period from November 1 through December 31;

(ii)     to the extent same is commercially reasonable, scaffolding and construction barricades shall be erected in stages so as to minimize interference with Tenant's use and occupancy;

#3104972v10

(iii)    the scaffolding and construction barricades shall be erected immediately prior to the commencement of the repair work (as practicable) and shall be removed promptly after the completion of the repair work, except as required by any applicable legal requirements;

(iv)    any work requiring scaffolding or construction barricades shall be prosecuted as diligently as possible in the exercise of commercial reasonableness, force majeure excepted;

(v)    Landlord shall maintain access to the Premises at all times despite the erection of scaffolding or construction barricades, and Landlord shall erect signs which identify from the street how to access the Premises through the scaffolding or construction barricades;

(vi)    only Tenant shall have the right to place its signage on scaffolding and construction barricades directly in front of the Premises, subject to compliance with this Lease and applicable laws and ordinances in connection therewith.  Landlord shall reimburse Tenant for its reasonable costs of installing and maintaining such signage, not to exceed Two Thousand Dollars ($2,000.00) (which amount shall increase by three percent (3%) per calendar year on a compounding basis);

(vii)    Landlord shall not be permitted to place any other signage or advertisement on any scaffolding or construction barricades directly in front of the Premises without the consent of Tenant, which Tenant may grant or deny in its sole and absolute discretion; nothing herein shall prohibit another tenant's signage from being placed on scaffolding or elsewhere pursuant to its lease provided such signage is not placed directly in front of the Premises;

(viii)    Landlord shall be required to provide any legally required lighting underneath and along such scaffolding, and such lighting should be subject to the reasonable approval of Tenant;

(ix)    Other than in the case of an emergency, Landlord shall give Tenant at least ten (10) days' advance notice of any scaffolding Landlord plans to install; and

(x)    If scaffolding remains in place for more than twelve consecutive months, Tenant shall be entitled to a rent abatement equal to fifty percent (50%) of Base Rent until the scaffolding is removed.

**Section 2.4    Basement Space**.

A.    Provided Landlord has not terminated this Lease due to a Tenant default of this Lease, beyond applicable notice and cure periods, Tenant shall have the (i) exclusive right to use certain space in the basement of the Building, containing approximately 2,234 square feet, approximately delineated as "Available Tenant C and Tenant D Stock Room" on the Basement Plan attached hereto as Exhibit "H" and made a part hereof ("Basement Space"); and (ii) the nonexclusive right to use the basement common corridor for ingress and egress to the Basement Space.  Tenant shall not be required to pay any Base Rent for the Basement Space, and the square footage of the Basement Space shall not be included in calculating Tenant's Share of Taxes and Tenant's Share

of Expenses. Landlord shall have no obligations to Tenant with regard to the Basement Space, makes no representations or warranties concerning the Basement Space except as expressly provided herein, and is not required to provide any services or construction in the Basement Space. Tenant shall accept the Basement Space as "AS IS" condition. All work in the Basement Space shall be performed by Tenant, at Tenant's sole cost, subject to plans and specifications approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed. All terms and obligations of the Lease that apply to the Tenant for the Premises (except as provided above with respect to Base Rent and Tenant's Share of Taxes and Expenses) shall have the same force and effect upon Tenant for its use of the Basement Space, including but not limited to, Tenant's obligations for maintenance, repairs, insurance, indemnities and surrender. Tenant may use the Basement Space solely for storage of inventory for goods being sold at the Premises. Landlord shall have the right to access the Basement Space and cause repairs to the Building in accordance with the Lease. Tenant shall not have the right to separately assign or sublease the Basement Space. Any rights granted Tenant pursuant to this Section 2.4 shall expire concurrently with the expiration or earlier termination of the Lease.

B.     There is located in the Basement Space along the south wall a network interface device ("NID") for the Building. Tenant shall allow Landlord, and its contractors, utility companies, and agents access to the NID (upon reasonable notice, except in cases of exigent circumstances) to maintain, repair and replace the NID. Landlord, at Landlord's election, may relocate the NID outside of the Basement Space.

**ARTICLE III**
**LEASE TERM**

### Section 3.1     Term

The Initial Term of this Lease shall commence on the Commencement Date specified in Section 1.6 and end on the Expiration Date specified in Section 1.7, unless sooner terminated pursuant to any provision of this Lease. The term "Term" means the Initial Term, any Partial Lease Month (as defined in Section 3.2 below), and any exercised "Option Period" pursuant to Section 3.5.

### Section 3.2     Lease Year Defined

The term "Lease Year" means a period of twelve (12) consecutive calendar months. The first full Lease Year shall commence on (a) the Commencement Date, if the Commencement Date is the first day of the calendar month or (b) the first day of the calendar month following the Commencement Date, if the Commencement Date is not the first day of the calendar month, and each succeeding Lease Year shall commence upon the anniversary date of the first Lease Year. Any portion of the Term of this Lease commencing prior to the first full Lease Year shall be deemed a "Partial Lease Month."

### Section 3.3     Confirmation of Dates

Upon the request of either party, both Tenant and Landlord agree to execute a written instrument certifying the Commencement Date, the Expiration Date of this Lease, as well as the

date Tenant opened the Premises for business to the general public, provided that this Lease shall not be affected in any manner if either party fails or refuses to execute such instrument.

### Section 3.4    Binding Effect

Notwithstanding the Commencement Date of the Term of this Lease, the parties shall be bound by all the terms, covenants, conditions and provisions contained herein, from and after the Effective Date.

### Section 3.5    Option to Extend Term

A.      Tenant, by written notice to Landlord given no later than one hundred eighty (180) days before the Expiration Date, shall have the option to renew this Lease for an additional period of five (5) full Lease Years (the "First Option Term") commencing on the expiration of the Initial Term of this Lease, pursuant to all of the terms, covenants, and conditions of this Lease and at the Base Rent set forth in Section 1.10 (Eleventh through Fifteenth Lease Years), and Additional Rent set forth in Article IV hereof, provided that at the time the notice hereinabove referred to is given and at the time the First Option Term commences, Tenant is (i) open and operating the Premises for a use permitted by this Lease (except for any Permitted Closure, as defined in Section 9.1); and (ii) not materially in default hereunder beyond any notice and cure period. In the event Tenant does not send written notice as described herein, this Lease shall terminate on the Expiration Date.

B.      Tenant, by written notice to Landlord given no later than one hundred eighty (180) days before the expiration of the First Option Term, shall have the option to renew this Lease for an additional period of five (5) full Lease Years (the "Second Option Period") commencing on the expiration of the First Option Term, pursuant to all of the terms, covenants, and conditions of this Lease and at the Base Rent set forth in Section 1.10 (Sixteenth through Twentieth Lease Years), and Additional Rent set forth in Article IV hereof, provided that at the time the notice hereinabove referred to is given and at the time the Second Option Term commences, Tenant is (i) open for business and operating the Premises for a use permitted by this Lease except for any Permitted Closure; and (ii) not materially in default hereunder beyond any applicable notice and cure period. In the event Tenant does not send written notice as described herein, this Lease shall terminate at the expiration of the First Option Term.

### Section 3.6    Option to Terminate.

A.      Subject to the terms and provisions of this Section 3.6, Tenant shall have and is hereby granted the one-time right and option (the "Termination Option") to terminate the Lease effective at fifty-five (55) months after the Commencement Date (the "Early Termination Date"), which Termination Option shall be exercised by Tenant, if at all, by delivering written notice to Landlord of Tenant's exercise of such Termination Option ("Tenant's Termination Notice"), concurrently with payment of an early termination fee to Landlord in the amount of Three Hundred Twenty-Five Thousand Dollars ($325,000.00) ("Termination Fee"), on or before, but not later than, one hundred fifty (150) days prior to the Early Termination Date.

B.      The Termination Option is personal to Everlane, Inc. and may not be exercised by or for the benefit of, nor shall such Termination Option extend to, any assignee, subtenant, or any other party; provided, however, that the foregoing shall not apply in connection with any Tenant

Affiliate (as defined in Section 8(J) herein below). It shall be a condition of Tenant's right to exercise the Termination Option that Tenant is not in default beyond any applicable notice and cure period under any of the terms, covenants, or conditions of the Lease at the time that Tenant delivers Tenant's Termination Notice or upon the Early Termination Date. Tenant shall deliver the Premises to Landlord on or before the Early Termination Date in accordance with the terms and conditions of the Lease the same as if such Early Termination Date were the original Expiration Date of the Lease. In the event that Tenant exercises its Termination Option hereunder, Tenant shall execute and deliver to Landlord a lease termination agreement setting forth the terms of such Termination Option within thirty (30) days after Landlord's delivery of such agreement to Tenant, but in any event prior to the Early Termination Date.

C.  In the event Tenant properly elects to terminate the Lease in accordance with this Section 3.6, Landlord shall have the right to recapture the Premises from Tenant at any time after receipt of the Tenant's Termination Notice and Termination Fee upon thirty (30) days' prior written notice to Tenant of such recapture.

## ARTICLE IV
## RENT

### Section 4.1    Payment

A.  Base Rent, and the estimated Expense Charge and Tax Charge, shall be due and payable in advance, without prior demand or any right of offset or deduction, except as specifically set forth in this Lease, in monthly installments on the first day of each calendar month of the Term hereof. Notwithstanding the foregoing, with respect to the first payment of Base Rent, the estimated Expense Charge and the estimated Tax Charge, Landlord shall send Tenant an invoice on or after the Commencement Date specifying the amounts thereof then due, and Tenant shall pay the first payments thereof no later than ten (10) business days after Tenant's receipt of Landlord's invoice. All payments required to be made by Tenant to Landlord hereunder (or to such other party as Landlord may from time to time specify in writing) shall be made in lawful money of the United States of America by electronic funds transfer or similar method (or a technological evolution of same) of immediately available federal funds, as directed by Landlord. Landlord acknowledges that Tenant cannot make any payments to Landlord without Landlord's current federal tax identification number. Landlord represents that Landlord's current federal tax identification number is 30-0034528. Landlord shall promptly notify Tenant of any changes to such number.

B.  Tenant's covenant to pay Rent under this Lease is an independent covenant of Tenant and shall not be subject to any abatement, deduction, counterclaim, reduction, set off or defense of any kind whatsoever, except as specifically set forth in this Lease.

### Section 4.2    Past Due Rent and Late Charge

A.  Any Rent to be paid by Tenant which is not paid on or before the expiration of the notice and cure period provided for in Section 12.1 hereof shall bear interest from such date until the date paid at the Default Rate. In addition, if Tenant shall fail to pay any Rent on or before the expiration of the notice and cure period provided in Section 12.1 hereof, Tenant shall be obligated

to pay a late payment charge equal to five percent (5%) of the amount due to reimburse Landlord for its additional administrative costs. Notwithstanding the foregoing, for the first time in any calendar year that Tenant has failed to pay any such installment Rent, the late charge and any interest shall not apply unless Tenant has failed to make such payments within ten (10) days of receipt of Landlord's written notice of such delinquency.

The additional administrative fee set forth above is intended as reasonable estimate of Landlord's administrative costs and damages because of Tenant's failure to pay Base Rent or Additional Rent on a timely basis. The parties agree that this administrative fee is reasonable, bears significant relation to the actual administrative costs that Landlord might sustain, which administrative costs Tenant and Landlord agree it would be uncertain and difficult to prove, and it is not a penalty for Tenant's failure to pay Base Rent and Additional Rent. The acceptance by Landlord of said administrative fee shall not preclude Landlord from seeking and pursuing any other remedy under this Lease.

B.    Any payment by Tenant or acceptance by Landlord of a lesser amount than shall be due from Tenant to Landlord shall be treated as a payment on account. The acceptance by Landlord of a check for a lesser amount with an endorsement or statement thereon, or upon any letter accompanying such check, that such lesser amount is payment in full shall be given no effect, and Landlord may accept such check without prejudice to any other rights or remedies which Landlord may have against the Tenant.

**Section 4.3    Base Rent**

Payment of Base Rent shall begin on the Commencement Date. If the Commencement Date occurs on a day other than the first day of a calendar month, then Base Rent (as well as all Additional Rent) shall be prorated for the balance of that month based upon the actual number of days from the Commencement Date through the last day of said calendar month. The amount of each monthly installment of Base Rent for the Premises for the Initial Term of this Lease is specified in Section 1.10(i). The amount of each monthly installment of Base Rent for the Premises for each Option Term is specified in Section 1.10(ii).

**Section 4.4    Additional Rent**

A.    In addition to paying Base Rent, Tenant shall also pay other sums which may become due under this Lease, as additional Rent including, but not limited to, late charges, interest, "Expenses" (as defined in below in this Section 4.4), "Taxes" (as defined in below in this Section 4.4) and other sums coming due to Landlord or advanced by Landlord in performance of its obligations herein which are specifically set forth in this Lease. Tenant and Landlord agree that all other sums excepting Base Rent which may become due under the Lease shall be deemed "Additional Rent."

B.    As used in this Lease:

1.    "Adjustment Date" shall mean the Commencement Date, and each January 1 thereafter falling within the Term.

11

2.    "Adjustment Year" shall mean each calendar year during which an Adjustment Date falls.

3.    (a)    "Expenses" shall mean and include, except as excluded herein below, the reasonable costs and expenses paid or incurred by or on behalf of the Landlord for owning, managing, operating, maintaining and repairing the Building, including the Common Areas, and the personal property used in conjunction therewith, including, without limitation, the cost of (i) professional property management fees not in excess of three percent (3%) of all rent, taxes, and expenses collected by Landlord from all tenants at the Building, (ii) electricity and gas needed for the Common Areas and to operate mechanical equipment for the Building, (iii) the operation, maintenance and repair of the elevator, including the cost of power and a telephone line, (iv) maintenance of sewers, (v) the costs, maintenance and repair of the roof and the HVAC systems serving the Building, (vi) insurance for the Building, including but not limited to, fire, extended coverage, all risk, liability, workmen's compensation, loss of rental or business interruption, or any other insurance carried by the Landlord and applicable to the Building, (vii) painting, supplies, sundries, sales or use taxes on supplies or services, (viii) the charges of any entity  or individual who, under contract with Landlord or its representatives, does any of the work of operating, managing, maintaining or repairing the Building, provided that any management or administrative fee shall be limited as otherwise provided herein, (ix) legal and accounting fees and expenses related to the operation of the Building, (x) monthly exterminator service for the Common Areas, (xi) water for the Common Areas, and (xii) any fire alarm for the Common Area and its related costs; (xiii) snow and ice removal in and around the Building; (xiv) expenses incurred to remove debris and otherwise keep clean the Common Areas, including the Trash and Loading Yard and sidewalks in broom clean condition; (xv) any and all costs to operate and maintain the Trash and Loading Yard and restricted parking areas, including, but not limited to all permit and licensing fees; (xvi) any other expenses related to the maintenance and operation of the Building whether or not hereinbefore mentioned, and not otherwise excluded in the Section 4.4 B.(b) below.

(b)    Notwithstanding anything to the contrary in this Lease, in no event shall Tenant have any obligation to perform, pay directly, or reimburse Landlord for any of the following items, and they shall not be included in Expenses: (1) costs incurred in connection with the original construction or subsequent reconfiguration, depreciation, or upgrade of the Premises or the Building; (2) costs of correcting defects in the design or construction of the Building, or the material used in the construction of the Building or Building systems (including latent defects), provided that for the purposes of this clause (2) conditions (not occasioned by design or construction defects) resulting from ordinary wear and tear and use shall not be deemed defects; (3) real estate brokers' commissions, renovations or tenant improvements, or other costs incurred for attracting tenants or with respect to other rentable area; (4) costs resulting from the negligence or willful misconduct of any Landlord, or its agents, employees or contractors, or the default of Landlord under this Lease or any other agreement affecting Landlord or the Building; (5) legal, accounting or professional fees and costs incurred in connection with negotiations, disputes and claims of other tenants or occupants of the Building or with other third parties, the audit of any Landlord financial materials and requests related to any assignment or sublease; (6) interest and principal payments or other amortization or depreciation charges on the Building

12

(including the Building systems and equipment) or the indebtedness of Landlord; (7) overhead and profit paid to subsidiaries or affiliates of Landlord for management or other services for supplies or other materials to the extent the amounts incurred are in excess of those which would have been reasonably incurred if such supplies or services were obtained from unrelated third parties; (8) contributions to any political or charitable persons or entities; (9) costs for the acquisition of sculpture, paintings or other art objects; (10) advertising, marketing and promotion costs; (11) costs associated with the operation of the corporation or other entity which constitutes Landlord, as distinguished from costs of operation of the Building; (12) costs for which Landlord is or is entitled to be reimbursed under warranties or by insurance companies, other tenants, or other third parties; (13) reserves; (14) costs incurred to investigate, remove, remediate, or respond to any claim related to Hazardous Materials, or to comply with any claim of violation under applicable Environmental Laws; (15) costs of capital repairs or replacements, except for repairing or replacing Building systems if necessary in order to comply with Laws adopted after the Commencement Date of this Lease and (ii) costs of repairs or replacement of Building systems that result in savings in other Expenses, but only to the extent that the amortized annual amount of the cost of the repairs or replacements does not exceed the resulting savings in any calendar year; provided, that the costs of any capital repairs or replacements are amortized over their useful lives in accordance with generally accepted accounting principles consistently applied; (16) the costs and expenses incurred in leasing equipment or systems that would ordinarily constitute a capital expenditure if such equipment or systems were purchased, to the extent such rental charges exceed the amortization charge, if any, that would have been permitted had the item been purchased; (17) costs of repairs or other work necessitated by fire, windstorm or other casualty and/or costs of repair or other work necessitated by the exercise of the right of eminent domain; (18) the cost of insurance coverages not generally carried by landlords of similar Buildings in the area; (19) insurance deductibles and co-insurance payments; (20) interest or penalties due to the late payment of taxes, utility bills or other costs; (21) the costs, including fines, penalties, and legal fees incurred, (a) due to violations by Landlord, or any other tenant or occupant of the Building of Laws, the terms and conditions of any lease pertaining to the Building, or any other contract, or title matters, or (b) to comply with any Law and rules or any court order, decree or judgment as a result of a violation by Landlord, including, without limitation, the Americans with Disabilities Act; (22) any amount paid to an owners' association of which the Building is a part or paid in connection with any covenants, conditions, and restrictions or other title matters affecting the Building if such costs would be excluded from Expenses pursuant to other provisions of this Section; (23) rent under any ground lease or master lease; (24) costs incurred in connection with the financing or transfer of the Building or any part thereof (including the cost of any lender's policy of title insurance) or any interest therein; (25) the cost of any action that is specifically Landlord's expense under this Lease or any costs for which Landlord is required to pay or reimburse Tenant (including the cost of any repairs or replacements covered by Landlord's express warranties set forth in this Lease); (26) expenses which are separately metered or calculated for the Premises, which are billed separately to Tenant or one or more other tenant(s), as applicable; (27) wages, salaries and other compensation paid to personnel above the grade of property manager; (28) rates paid on service or other contracts to the extent the cost thereof exceeds average market costs for such services of comparable quality in

13

comparable buildings; and (29) Landlord's general overhead and any other expense not directly related to the Building.

(c)  Notwithstanding anything contained in this Section 4.4.B.3 to the contrary:

(i)  If any item of Expenses, though paid or incurred in one year, relates to more than one calendar year, such item shall be proportionately allocated among such related calendar years.

(ii)  Expenses shall also include those reasonable costs and expenses paid or incurred by Landlord in connection with the maintenance, repair and replacement of the public areas and landscaping adjacent to the Building which benefit the Building and which are not otherwise included in Expenses.

(iii)  Tenant, at its expense, shall perform janitorial services as reasonably required within the Premises.

(iv)  The portion of Tenant's Share of Expenses for professional property management fees shall not exceed Twenty Thousand Dollars ($20,000.00) for the first full Lease Year, which amount shall be increased by three percent (3%) per calendar year thereafter on a compounding basis.

4.  (a)  "Taxes" shall mean the Building's real estate taxes, assessments (whether they be general or special), including out of pocket legal and accounting fees and expenses related to seeking or obtaining reductions in and refunds of real estate taxes, sewer rents, rates and charges, transit taxes, and any other federal, state or local governmental charge, general, special, ordinary or extraordinary (but not including income or franchise taxes or any other taxes imposed upon or measured by the Landlord's income or profits, except as otherwise provided herein), which may now or hereafter be levied, imposed or assessed against the Building and the land and space upon and within which the Building is located (the "Land").  The Building and the Land are herein collectively called the "Real Property."

(b)  Tenant shall not be required to pay the following, and the following will not be included in Taxes:  (1) any municipal, county, state, or federal income tax; (2) any inheritance, estate, gift, succession, transfer, franchise, corporation, net income or profit tax or capital levy, or gross receipts, imposed upon Landlord; (3) any "roll-back" or similar taxes attributable to periods before the Term; (4) any penalties or interest other than those attributable to Tenant's failure to comply timely with its obligations pursuant to this Lease, (5) any excise taxes imposed upon Landlord based upon gross or net rentals or other income received by it, and (6) assessments for improvements completed prior to the Commencement Date.

(c)  Landlord shall forward to Tenant a copy of any other notices, invoices and statements relating to the Taxes after receipt of same, and shall provide a copy of the tax bill applicable to the Premises to Tenant upon request.

#3104972v10

(d)     Tenant shall be entitled to a refund of any Taxes (and penalties or interest thereon) received by Landlord which have been paid by Tenant, or which have been paid by Landlord but previously reimbursed in full by Tenant.

(e)     Notwithstanding anything contained in this Section 4.4.B.4 to the contrary,

(i)     If at any time the method of taxation then prevailing shall be altered so that any new, additional or substitute tax, assessment, levy, imposition or charge or any part thereof shall be imposed upon Landlord in place or partly in place of any such Taxes, and shall be measured by or be based in whole or in part upon the Real Property, or the rents or other income therefrom, then all such new or substitute taxes, assessments, levies, impositions or charges or part thereof, to the extent that they are so measured or based, shall be included in Taxes levied, imposed or assessed against the Real Property to the extent that such items would be payable if the Real Property were the only property of Landlord subject thereto, and the income received by Landlord from the Real Property were the only income from Landlord.

(ii)     Notwithstanding the year for which any such taxes or assessments are levied, (A) in the case of special taxes or assessments which may be payable in installments, Landlord shall take advantage of the benefit of paying in installments, and the amount of each installment, plus any interest payable thereon, paid during a calendar year shall be included in Taxes for that year and if any taxes or assessments payable during any calendar year shall be computed with respect to a period in excess of twelve calendar months, then taxes or assessments applicable to the excess period shall be included in Taxes for that year. Except as provided in the preceding sentence, all references to Taxes "for" a particular year shall be deemed to refer to taxes levied, assessed or otherwise imposed for such year without regard to when such taxes are payable, but shall not include any portion of taxes levied, assessed or imposed but not required to be paid due to a reduction of assessed valuation.

(iii)     Taxes shall also include any personal property taxes (attributable to the calendar year in which paid) imposed upon the furniture, fixtures, machinery, equipment, apparatus, systems and appurtenances used in connection with the Real Property or Building or the operation thereof.

**Section 4.5     Computation and Payments of Additional Rent; Projections.**  Tenant shall pay Additional Rent on the first day of each calendar month, commencing on the Commencement Date and continuing throughout the Term.  Additional Rent payable by Tenant shall include Tenant's Share of Expenses, as set forth in Section 1.16 (the "Expense Charge"); plus Tenant's Share of Taxes as set forth in Section 1.16 (the "Tax Charge").  Tenant shall pay Additional Rent to Landlord in the manner hereinafter provided, subject to readjustment as provided in subsection (B.) below.

A.     Expense Charge and Tax Charge.  Tenant shall make payments on account of Expense Charge and Tax Charge (the aggregate of such payments with respect to any Adjustment

Year being called "Additional Rent Progress Payment") effective as of the Adjustment Date for each Adjustment Year as follows:

1.     Landlord shall, prior to each Adjustment Year, or as soon as practicable thereafter, deliver to Tenant a written notice or notices ("Projection Notice") setting forth (i) Landlord's reasonable estimates, forecasts, or projections (the "Projections") of any or all of Taxes and Expenses for such Adjustment Year and (ii) the amount of Tenant's Additional Rent Progress Payment with respect to each component of Additional Rent for such Adjustment Year based upon the Projections.  Landlord may revise the Projections in the event Landlord obtains additional information to more reasonably estimate the Taxes or Expenses.

2.     Tenant shall pay to Landlord a monthly installment of Additional Rent Progress Payment with respect to each component of Additional Rent at the time of each payment of Base Rent, equal to the monthly installment of the Additional Rent Progress Payment, or one-twelfth (1/12) of Tenant's Expense Charge and Tax Charges as determined by Landlord.  On or before the first day of the next calendar month next following Landlord's service of a Projection Notice, and on or before the first day of each month thereafter, Tenant shall pay to Landlord one-twelfth (1/12) of the Additional Rent Progress Payment shown in the Projection Notice.  Within thirty (30) days following Landlord's service of a Projection Notice, Tenant shall also pay Landlord a lump sum equal to any underpayment.

3.     Tenant shall pay monthly installments of Additional Rent Progress Payment equal to said initial monthly installment from and after the Commencement Date until the same is changed pursuant to a Projection Notice from Landlord as provided above.

4.     Notwithstanding anything to the contrary contained herein, solely during the First Lease Year, the amount of Tenant's Share of Expenses shall not exceed Twenty-One Thousand Two Hundred Fifteen Dollars ($21,215.00), and the amount of Tenant's Share of Taxes shall not exceed Ninety-Three Thousand Three Hundred Forty-Six Dollars ($93,346.00).

5.     Notwithstanding anything to the contrary contained herein, commencing with the Second Lease Year and continuing for each subsequent Lease Year thereafter, the amount of Tenant's Share of Expenses, excluding (i) professional property management fees, and (ii) "non-controllable" costs and expenses, such as insurance, utilities, sidewalk repairs and snow removal; shall not exceed one hundred five percent (105%) of the amount of Tenant's Share of Expenses for the immediately preceding Lease Year.

B.     Readjustments.  On or prior to April 1 during each calendar year of the Term, Landlord shall determine the actual amounts of any or all of Expenses and Taxes, to be used in calculating the Expense Charge and Tax Charge for the prior Adjustment Year, and Landlord shall notify Tenant in writing ("Landlord's Statement") of such Expenses and Taxes, a calculation of

16

Tenant's Share of Expenses and Tenant's Share of Taxes, and the total of Tenant's Additional Rent Progress Payment for such Adjustment Year. The Landlord's Statement shall be certified by Landlord as having been calculated in conformity with the definitions of and exclusions from Taxes and Expenses provided in this Lease. The obligation to send such statements shall survive the expiration of the term or earlier termination of this Lease. As to Tax Charges, Landlord shall provide Tenant a true and correct copy of each final tax billing or each reassessment notice as the case may be and a statement for costs and fees related to each, if any.

      1.      If the Expense Charge owed or paid by Landlord for such Adjustment Year exceeds the Expense Charge component of the Additional Rent Progress Payment paid by Tenant during such Adjustment Year, then, Tenant shall, within thirty (30) days after the date of Landlord's Statement, pay to Landlord the difference. If the Expense Charge component of the Additional Rent Progress Payment paid by Tenant during such Adjustment Year exceeds the Expense Charge owed for such Adjustment Year, then Landlord shall with Landlord's Statement refund to Tenant any such excess, or credit such excess against Additional Rent Progress Payments. Such obligations for the last Adjustment Year of the Term shall survive the expiration or earlier termination of this Lease.

      2.      If the Tax Charge owed or paid by Landlord for such Adjustment Year exceeds the Tax Charge component of the Additional Rent Progress Payment paid by Tenant during such Adjustment Year, then, Tenant shall, within thirty (30) days after the date of Landlord's Statement, pay to Landlord an amount equal to the excess of the Tax Charge over the Tax Charge component of the Additional Rent Progress Payment paid by Tenant during such Adjustment Year. If the Tax Charge component of the Additional Rent Progress Payment paid by Tenant during such Adjustment Year exceeds the Tax Charge owed for such Adjustment Year, then Landlord shall with Landlord's Statement refund to Tenant any such excess, or credit such excess against Additional Rent Progress Payments. Such obligations for the last Adjustment Year of the Term shall survive the expiration or earlier termination of this Lease.

      3.      No interest or penalties shall accrue on any amounts which Landlord or Tenant is obligated to credit or pay to the other by reason of this Section.

**Section 4.6    Books and Records**. Landlord shall maintain books and records showing Expenses and Taxes in accordance with generally accepted accounting principles for a period of three (3) years following each Adjustment Year. Tenant or its representative shall have the right to examine Landlord's books and records showing Expenses and Taxes upon reasonable prior notice and during normal business hours at any time within one (1) year following the furnishing by the Landlord to the Tenant of Landlord's Statement as required under Section 4. Unless Tenant shall take written exception to any item within one hundred eighty (180) days after the furnishing of the Landlord's Statement, Landlord's Statement shall be considered as final and accepted by the Tenant. Tenant shall pay any amounts as and when required under this Section, notwithstanding its written exception taken as to any particular item. Upon Tenant's request to audit the Expenses or Taxes, Landlord shall make available to Tenant electronically, or at Tenant's election, at the Premises or Landlord's designated office located in the same county as the Premises, for

17

photocopying by Tenant (or Tenant's employee or designated representative), invoices of expenditures, as well as other standard Landlord reports, for Expenses or Taxes (as well as for any relevant prior year, if readily available, for purposes of evaluating compliance with the limitations on increases in Expenses or Taxes). In the event Tenant's examination determines errors in the Expense Charge paid by Tenant, then the appropriate party will make a correcting payment in full to the other party within thirty (30) days after the determination and communication to all parties of the amount of such error. In the event of any errors on the part of Landlord costing Tenant in excess of four percent (4%) of Tenant's actual Expense Charge for any Adjustment Year, Landlord will also, prior to the expiration of the above thirty (30) day period, reimburse Tenant for the reasonable costs of an audit actually incurred by Tenant. Tenant's right to receive the statements of Expenses or Taxes and to perform the audit shall survive the termination or expiration of this Lease. If Landlord does not agree with Tenant's written exception, then within thirty (30) days after Landlord's receipt of Tenant's written exception, Landlord and Tenant shall jointly select an independent certified public accountant to resolve the dispute. The independent certified accountant shall have an additional thirty (30) days in which to examine Landlord's books and records during business hours upon reasonable notice to Landlord and to notify both Landlord and Tenant as to the resolution of the disputed item or items. If the dispute is resolved in favor of Tenant, Landlord shall refund to Tenant any amounts improperly charged to Tenant which Tenant has paid Landlord. The fees of the independent certified accountant shall be paid by the party against whom such dispute was resolved. In the event Landlord fails to make written demand upon the Tenant for the Tenant's Share of any Additional Rent and/or other charges payable in accordance with the terms of this Lease within a period of two (2) years after the Adjustment Year in which said Additional Rent and/or other charges were incurred then, and in that event, the Tenant's liability for such charges shall expire.

Section 4.7    **Proration and Survival**. With respect to any Adjustment Year which does not fall entirely within the Term, Tenant shall be obligated to pay as Additional Rent for such Adjustment Year only a pro rata share of Additional Rent as hereinabove determined, based upon the number of days of the Term falling within the Adjustment Year.

Section 4.8    **No Decrease In Base Rent**. In no event shall any Additional Rent result in a decrease of the Base Rent payable hereunder.

**ARTICLE V**
**UTILITIES**

Section 5.1    **Utilities**. Beginning on the Effective Date, Tenant shall make application for and pay for be solely responsible for all utilities used or consumed in the Premises, including, but not limited to, electricity, gas, water, (including water for domestic uses and for fire protection), telephone, cable TV and internet service, sewer service, and any similar service, except to the extent charges for any such services are included in Expenses or Taxes. In the event that any charge for any utility supplied to the Premises which is directly billed to the Tenant is not paid by Tenant to the supplier when due, and Tenant's failure to do so has a material adverse impact on the Building, then Landlord may, but is not required to, following notice to Tenant of such non-payment and the expiration of the applicable cure period pay such charge for and on behalf of Tenant, with any such amount paid by Landlord being repaid by Tenant to Landlord as Additional Rent without ten (10) days after demand. To the extent otherwise available, Tenant shall not be

18

required to obtain any utility services from Landlord, but instead may obtain all utility services (excluding water and trash collection, but including HVAC services) directly from the utility supplier. If Landlord shall elect to supply any utilities to the Premises, or if any utility is not separately metered, then Tenant shall pay to Landlord the cost of its utility consumption based upon separate metering devices supplied by Landlord, if available. Landlord agrees that the cost to Tenant of any utilities supplied by Landlord shall be reasonable and competitive, shall not exceed Landlord's actual costs for such utility, shall not include any administrative or other surcharge added by Landlord, and shall not exceed the amount Tenant would have paid if it independently obtained such service from the local utility supplier. If any utility services supplied by Landlord are not separately metered, Tenant shall pay only Tenant's Utility Share thereof. "Tenant's Utility Share" means that amount, expressed as a percentage which is represented as a fraction, the numerator of which is the gross leasable floor area of the ground floor Premises and the denominator of which is the gross leasable floor area of those premises using such utility, but adjusted proportionately for any premises whose occupant uses an extraordinary amount of such utility. If Landlord supplies any utility service that is not separately metered, Tenant, at Tenant's cost, shall have the right to install a check meter or submeter for any such utility, and Tenant, at Tenant's cost, but with Landlord's consent, shall further be entitled to alter, increase, upgrade, remove or reconfigure any utilities as reasonably necessary for Tenant's use of the Premises. If Tenant elects to obtain any utilities from Landlord, then Landlord may discontinue such service only upon the later to occur of ninety (90) days after Tenant's receipt of notice from Landlord or the date on which comparable service is otherwise available to Tenant, but in no event shall Landlord permit such discontinuance to disrupt Tenant's business.

**Section 5.2    Water**

Notwithstanding anything to the contrary, water use will not be separately metered for the Premises. Subject to the terms of Section 5.1, Landlord shall invoice Tenant for reimbursement of Tenant's water use based upon Tenant's Utility Share of water services on an annual or other basis, and Tenant shall pay Tenant's water usage or Tenant's Utility Share promptly along with the following month's Base Rent. Landlord shall deliver to Tenant copies of the City water bill invoices on an annual basis.

**Section 5.3    Interruption**. Unless caused by the negligence or willful misconduct of Landlord, its employees, agents, or contractors, Landlord and Tenant hereby agree that Landlord shall not be liable for any interruptions or curtailment in utility services due to causes beyond its control or due to Landlord's alteration, repair or improvement of the Premises or the Building. Notwithstanding the foregoing to the contrary, if any interruption of any utility service is caused by Landlord which materially and adversely interferes with the conduct by Tenant of its business, then Base Rent and Additional Rent shall equitably abate to the extent of such interference for each day or portion thereof that such interference continues, and if such interference causes Tenant, in the exercise of its reasonable business judgment, to close the Premises for business, then Base Rent and Additional Rent shall totally abate for each day or portion thereof that such interference continues.

**Section 5.4    Electric Service**. Landlord confirms that Tenant will be able to use 400 amps of 3 phase, 120/208 electric service (the "Planned Electrical Capacity") at the Premises without material adverse impact on other occupants of the Building and without the need for an

upgrade from the applicable electrical utility. If the Premises has more than the Planned Electrical Capacity, Tenant agrees that Landlord may, at Landlord's cost, distribute electrical capacity above the Planned Electrical Capacity to other parts of the Building.

**ARTICLE VI**
**ACCEPTANCE OF POSSESSION**

**Section 6.1** **"As Is" Condition**. Tenant acknowledges and agrees that the Premises and the Basement Space are being leased to Tenant "AS IS," WITHOUT ANY REPRESENTATIONS OR WARRANTIES, INCLUDING ANY EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS OR HABITABILITY, AND WITHOUT ANY OBLIGATION TO ALTER, REMODEL, IMPROVE, REPAIR, DECORATE OR CLEAN ANY PART OF THE PREMISES. Except as required by Section 17.1 of the Lease, Landlord shall have no obligation to perform any work at the Premises.

**Section 6.2** **Tenant's Work**

A. All Tenant's Work shall be performed by Tenant, at Tenant's expense, as set forth in Tenant's plans and specifications approved by Landlord, which approval shall not be unreasonably withheld, delayed or conditioned. Tenant's Work shall be performed diligently and promptly, at Tenant's expense in accordance with the requirements of the General Provisions for Tenant's Work, as described on Exhibit C and the other provisions of this Article VI.

B. Notwithstanding anything to the contrary contained herein, Tenant, at Tenant's sole cost, shall be responsible to cause the items of work described in Exhibit "J" ("Exhibit J Work") to be completed which shall be included in the Tenant's Work. The Exhibit J Work shall be subject to the prior written approval of Landlord, which approval will not be unreasonably withheld, delayed or conditioned. Tenant shall provide Landlord with a certificate of occupancy for the Premises. Exhibit "J" is included for reference only, and nothing contained therein shall obligate Landlord to, construct, perform, deliver, provide, warrant, reimburse or pay for, or ensure any work or condition described therein.

**Section 6.3** **Tenant's Obligations Before Commencement Date**

A. Tenant shall prepare plans and specifications of Tenant's Work and submit same to Landlord for the Landlord's review and approval which approval shall not be unreasonably withheld, delayed or conditioned. Tenant's submission to Landlord will include at least two (2) prints of plans and specifications of Tenant's Work to be done. Tenant shall provide Landlord, at Tenant's expense, Tenant's construction drawings in CAD format with photographs of Tenant's store installation, construction materials, lighting package, display features, ceiling treatments and signage packages. Within ten (10) days after Tenant submits plans and specifications to Landlord, Landlord shall notify Tenant of any failure of Tenant's plans to meet with Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed. Tenant shall then cause Tenant's plans to be revised and resubmitted to the Landlord for Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed. When Landlord or its designated agent has approved the original or revised Tenant's plans, Landlord shall initial and return one set of approved Tenant's plans to Tenant. Tenant's plans, as approved by the Landlord,

20

are herein called the "Tenant's Plans". Tenant shall not commence any of Tenant's Work until Landlord has approved the Tenant's Plans. Failure by Tenant to timely submit plans shall not delay the occurrence of the Commencement Date.

B.      If Landlord fails to respond within the time required herein to any plans and specifications submitted by Tenant, then Tenant may deliver a second request with a conspicuous notice that failure to respond will result in a deemed approval, and if Landlord does not respond to the second request within ten (10) days, Landlord shall be deemed to have approved Tenant's plans and specifications.

C.      Notwithstanding anything to the contrary, Landlord may disapprove in its sole discretion, any proposed Tenant's Work (except with respect to a mezzanine, which shall be subject to Section 6.3 D below) which impacts the structural components of the Premises or the Building or materially increases Landlord's costs.

D.      Landlord acknowledges that Tenant may elect to install a mezzanine, and its related components, such as stairs (collectively "Mezzanine") in the Premises. Notwithstanding anything to the contrary, the Mezzanine shall be constructed and maintained in accordance with all applicable Laws. Tenant shall submit the plans for the Mezzanine for Landlord's review and approval, which approval Landlord will not unreasonably withhold. Tenant shall bear all costs associated with installing the Mezzanine, including any structural work required in connection with the Mezzanine. Tenant shall be solely responsible to maintain and repair the Mezzanine, and any portions of the Premises affected by the Mezzanine in good order and repair. If Tenant elects to install the Mezzanine, no Base Rent shall be payable with respect to the Mezzanine, and the square footage of the Mezzanine shall not be included in calculating Tenant's Share of Taxes or Tenant's Share of Expenses. Tenant, in its sole discretion, may elect to leave the Mezzanine in place, in good order and repair, at the end of the Term, or it may elect to remove the Mezzanine, provided that it repairs any damage caused by removal. Notwithstanding anything to the contrary contained herein, Landlord makes no representations, or warranties, nor shall have any responsibilities with regard to the construction, maintenance, operation, repair or replacement of the Mezzanine

### Section 6.4    Tenant's Construction

A.      Tenant shall perform Tenant's Work with due diligence and in substantial accordance with the Tenant's Plans. In no event shall Tenant's failure to fulfill its obligations under Section 6.3 affect the Commencement Date, or any obligation of Tenant hereunder, and no such failure shall be construed in any way to extend the Term.

B.      All construction work to be performed by Tenant hereunder shall be performed in a good and workmanlike manner in full compliance with all applicable Law. Tenant agrees to procure and pay for all necessary permits, licenses and consents required in connection with such construction and that such construction work shall not materially interfere with the conduct of Landlord's or any other tenant's business in the Building. Landlord, and Landlord's consultants or agents, shall have the right from time to time to inspect the Tenant's Work for compliance with the terms hereof.

C.      Notwithstanding anything to the contrary contained herein, Tenant, at Tenant's sole cost, shall be responsible for any work performed in connection with the Basement Space pursuant to plans and specifications approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.

**Section 6.5     Landlord's Contribution to Tenant's Work**

A.      So long as Tenant is not in default of this Lease beyond applicable notice and cure periods (it being understood and agreed that upon the cure of any such default, Landlord shall within ten (10) business days after such cure pay any portion of the Base Contribution then due to Tenant), Landlord shall pay to Tenant, as "Landlord's Contribution to Tenant's Work" (which shall include the Exhibit J Work), Eight Hundred Thousand Dollars ($800,000.00) (the "Base Contribution"), which said sum shall be paid to Tenant as follows:

(1)      90% within ten (10) days after the latest of (i) the date Tenant has opened for business at the Premises, (ii) the payment of the first month's Rent; or (iii) delivery of all applicable partial lien waivers; and

(2)      10% within ten (10) days after the satisfaction of the items listed in Section 6.5 B. below.

B.      Prior to the disbursement of the amount required by Subparagraph (2) above, Tenant's Work shall have been completed in all material respects and substantially in accordance with the provisions of the Exhibit C to this Lease and Tenant's Plans, any punch list items reasonably specified by Landlord shall have been corrected to Landlord's reasonable satisfaction; and

(1)      Tenant shall have furnished Landlord a final standard sworn "owners" statement/affidavit; and

(2)      Tenant shall have furnished Landlord a final standard sworn "general contractor's" statement/affidavit; and

(3)      Tenant shall have furnished to Landlord final lien waivers from all general contractors subcontractors and materialmen who supplied services or material in performing Tenant's Work; and

(4)      Tenant shall have executed and delivered to Landlord an instrument certifying the Commencement Date and the Expiration Date of this Lease pursuant to Section 3.3 of this Lease; and

(5)      Tenant shall have provided Landlord with a copy of the certificate of occupancy (or its equivalent) for the Premises issued by the City;

(6)      Tenant shall have provided Landlord with field-marked "as built" drawings of the Premises and Tenant's Work or working drawings marked to show field conditions; and

(7)      Tenant shall have executed and delivered to Landlord and/or any mortgagee of Landlord, if requested, an estoppel certificate and a subordination agreement in the form attached hereto as Exhibit "G."  Landlord shall provide the final form of such documents within thirty (30) days after Tenant opens for business.

C.      Notwithstanding anything to the contrary contained herein, Tenant shall at all times comply with Article XVIII of the Lease.

D.      In the event Landlord fails to pay any portion of the Base Contribution, within ten (10) days after its due date, Tenant shall have the right to apply any portion of the delinquent Base Contribution, including interest thereon at the Default Rate to Rent payable by Tenant following satisfaction of the conditions set forth in this Section 6.5 until the Base Contribution is fully offset. All leasehold improvements in the Premises whose cost is paid or reimbursed by the Base Contribution shall belong to Landlord provided that Tenant is hereby granted and shall retain throughout the term a leasehold interest therein.  Notwithstanding anything in any design criteria, tenant handbook, sign criteria, the Lease or any exhibit, (1) Tenant shall not be liable to Landlord for any chargebacks relating to Landlord's preparation of the Premises for Tenant, (2) no other charges or fees of any kind (including without limitation, any construction coordination fees or plan review fees) shall be borne by Tenant to Landlord or its agents pursuant to Landlord's plan approval, and (3) Tenant shall not be required to pay for any construction deposit or any construction or performance bonds.

**Section 6.6      Building Permit**

A.      Tenant, at Tenant's cost, shall (i) apply to the City as soon as practicable, for all approvals necessary to  obtain a building permit in order to construct Tenant's Work (the "Building Permit"), and (ii) promptly diligently and in good faith obtain the Building Permit from the City. Tenant shall notify Landlord of the date it is submitting its application for the Building Permit ("Application Date") and shall keep the Landlord timely informed on the status of the issuance of same.  Notwithstanding anything to the contrary contained herein, Tenant shall endeavor to use the self-certification permit program offered by the City to expedite obtaining the Building Permit, provided that the parties acknowledge that Tenant's planned changes to the storefront or its installation of the Mezzanine may preclude Tenant from using the Self-certification process. Tenant may not commence the Tenant's Work until Tenant receives the Building Permit.

B.      At Tenant's request, Landlord shall execute any applications, submissions and other documents which may be reasonably required in order for Tenant to obtain the Building Permit.  Landlord and Tenant agree to cooperate fully with each other in all other reasonable matters as may be required to obtain the Building Permit, at no cost to Landlord. Tenant shall deliver a copy of the Building Permit and other permits to Landlord after the issuance of same.

C.      Tenant shall use commercially reasonable and diligent efforts to obtain the Building Permit on or before March 31, 2020 ("Permit Deadline Date").  In the event Tenant fails to obtain the Building Permit by the Building Permit Deadline Date, and the sole reason for such failure was an existing Building condition defect ("Building Defect") not caused by Tenant, such as an existing building code violation, then Tenant may provide Landlord with written notice of such failure to obtain the Building Permit no later than April 10, 2020 ("Permit Failure Notice").  The Permit

23

Failure Notice shall be accompanied with written evidence from the City confirming that the City's failed to issue the Building Permit due to a Building Defect. Tenant acknowledges that in the event Tenant is unable to obtain a Building Permit due to Tenant's acts or omissions, Tenant's Plans, Tenant's Work, or the Mezzanine, Tenant's sending of a Permit Failure Notice shall have no force or effect.

Landlord shall have ten (10) business days after the receipt of the Permit Failure Notice to elect in writing ("Landlord Notice"), in its sole discretion, to either (i) cure the Building Defect; or (ii) terminate the Lease. In the event Landlord elects to cure the Building Defect, Landlord shall diligently proceed to cure the Building Defect, and Tenant shall be entitled to a Rent abatement based on the number of days between the date Landlord receives the Permit Failure Notice, and the date Landlord substantially cures the Building Defect. Notwithstanding anything to the contrary contained herein, Landlord shall cure any Building Defect which causes the City not to issue the Building Permit, and which costs less than Two Hundred Fifty Thousand Dollars ($250,000.00) to repair, as determined by Landlord's architect.

## ARTICLE VII
## LABOR RELATIONS

Tenant shall not be required to use union labor, but Tenant shall use commercially reasonable efforts to conduct its labor relations and its relations with its employees and agents in a manner to preserve labor harmony.

## ARTICLE VIII
## ASSIGNMENT OR SUBLETTING

A.      Except as set forth to the contrary in this Article VIII, Tenant shall not transfer, assign, sublet, enter into license, franchise or concession agreements, mortgage, pledge, encumber, hypothecate or otherwise transfer this Lease or the Tenant's interest in and to the Premises in whole or in part, or otherwise permit occupancy of all or any part thereof by anyone with, under or through it (the foregoing herein referred to as individually as a "Transfer" and collectively as "Transfers") without first procuring the written consent of Landlord, and which consent shall be requested as provided in subsection B. below. Any attempt to Transfer without the Landlord's written consent (except as permitted in subsection J. below) shall be void and confer no rights upon any third person. The prohibitions of this Article VIII shall be construed to refer to any acts or events referred to whether they occur by operation of law, legal process, receivership, bankruptcy or otherwise.

B.      In the event Tenant proposes to Transfer this Lease, and if Landlord's consent is required for such Transfer, Tenant shall first give written notice to Landlord of its intention to do so, which notice shall contain: (l) the name of the proposed assignee, sub-tenant or occupant (each a "Transferee"); (2) the terms of the proposed Transfer; (3) the most recent financial statement or other equivalent financial information concerning the proposed Transferee; and (4) a copy of the assignment or sublease.

C.      Landlord agrees, within thirty (30) days after receipt of such notice, to either:

      1.      Reasonably grant such consent; or

2.    Reasonably withhold its consent;

3.    If such Transfer is an assignment of this Lease or a sublet of substantially all of the Premises for the remainder of the term, terminate this Lease, in which event this Lease shall terminate on the proposed effective date of such assignment or sublet in accordance with the provisions of this Lease relating to the surrender of the Premises at the expiration of the Term, unless Tenant shall withdraw its request for Landlord's consent by written notice to Landlord within ten (10) days of receipt of Landlord's aforesaid election to terminate.  In no event shall Landlord be permitted to terminate this Lease in connection with a Transfer not requiring Landlord's consent as set forth in subsection J.

If Landlord so terminates this Lease, Landlord may, if it elects, enter into a new lease covering the Premises with the intended assignee or sublessee on such terms as Landlord and such person may agree; in such event, Tenant shall not be entitled to any portion of the profit, if any, which Landlord may realize on account of such termination and reletting.

D.    If Landlord fails to approve or disapprove Tenant's request for consent to a Transfer within such thirty (30) days, then Tenant shall deliver a second request with a conspicuous notice that failure to respond will result in Landlord's consent being deemed given, and if Landlord does not respond to the second request within ten (10) days, Landlord shall be deemed to have consented to the Transfer.

E.    It is hereby agreed that in addition to other reasonable grounds, the withholding of the consent described above will be deemed reasonable if:

(1)    In the reasonable judgment of Landlord, the proposed Transferee:

(a) is of a character or engaged in a business which is not keeping with the standards of the Building; or

(b) proposes to use the Premises in a manner that would involve a material increased risk of the use, release or mishandling of any Hazardous Substances;

(c) has a credit standing which, in the opinion of Landlord, is insufficient to assume the obligations under this Lease;

(d) intends to use the Premises for a use that would conflict with the prohibited uses or uses of other tenants in the Building; or

(e) is a tenant of the Building or a prospective tenant with whom Landlord has had discussions pertaining to the Building during the period six (6) months prior to the date of the Proposed Transfer.

(2)    An event of default has occurred and has not then been cured (provided that if Tenant cures such default within ten (10) days after Landlord notifies Tenant that it is

withholding consent on such basis, then this condition shall no longer permit Landlord to withhold its consent);

(3)     In the event of an assignment of the Lease, the proposed Transfer will not obligate the proposed Transferee to assume, and comply with, all of the terms of this Lease; or

(4)     The proposed Transfer shall (i) violate any Law or violate any exclusive use rights or other use restrictions contained in the lease of another tenant of the Building or the rights retained by Landlord; and (ii) not conform with Landlord's reasonable desired "tenant mix."

F.     The consent by Landlord to any Transfer shall not constitute a waiver of the necessity for such consent to any subsequent attempted Transfer.  Receipt by Landlord of Base Rent due hereunder from any party other than Tenant shall not be deemed to be a consent to any such Transfer, nor relieve Tenant of its obligation to pay Base Rent or Additional Rent for the full term of the Lease. Any permitted transferee shall remain fully liable to Landlord for the obligations of Tenant.

G.     Each such Transfer to which there has been consent shall be by instrument in writing, in form reasonably satisfactory to Landlord, Tenant and the Transferee, and shall be executed by the Transferor and the Transferee who shall agree in writing, to the extent applicable to such Transfer, for the benefit of the Landlord to assume, be bound by and perform the terms, covenants and conditions of this Lease to be done, kept and performed by Tenant.  One executed copy of such written instrument shall be delivered to Landlord.  Failure to first obtain in writing Landlord's consent, or failure to comply with the provisions of this Article VIII, shall operate to prevent any such Transfer from becoming effective.  Notwithstanding any such Transfer, Tenant shall remain fully liable on this Lease and shall not be released from performing any of the terms, covenants and conditions of this Lease.

H.     If as part of a sublease of all or substantially all of the Premises (requiring Landlord's consent), the Base Rent required to be paid by such sublessee exceeds the Base Rent reserved hereunder, then Tenant shall pay to Landlord, on demand, fifty percent (50%) of the amount of such excess (after deducting the reasonable and actual costs and expenses incurred by Tenant, in connection with such sublease, including brokerage and legal fees and costs of preparing the Premises for such sublease, which may include allowances and free rent, but in no event shall such deduction exceed One Hundred Fifty Thousand Dollars ($150,000.00) in the aggregate), with Tenant's monthly payment of Base Rent, which shall be deemed Additional Rent.  No such excess shall be payable in connection with a Transfer not requiring Landlord's consent as set forth in subsection J.

I.     Landlord shall have the right to assign this Lease without the consent of Tenant.

J.     Notwithstanding anything to the contrary contained in this Article VIII, Tenant shall have the right, without consent of Landlord, to assign the Lease or sublet the Premises to a "Tenant Affiliate" (hereinafter defined). As used herein, the term "Tenant Affiliate" shall refer to a person or entity (i) that directly or indirectly (through one or more intermediaries) Controls

(hereinafter defined), is Controlled by, or is under common Control with Tenant (each a "Tenant's Related Party"); or (ii) results from a merger, consolidation, or reorganization with Tenant or Tenant's Related Party; or (iii) acquires all or substantially all of the assets or a majority or more of the equity of Tenant or of Tenant's Related Party. Furthermore, notwithstanding anything to the contrary contained in this Lease, in no event shall any transaction effecting a change of ownership interest in, or change of control of, Tenant or any Tenant's Related Party be deemed to be a Transfer under the terms of this Lease. "Control" as used herein shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of the entity in question, whether through ownership of voting securities or by contract, without regard to the degree such individual or entity actually has an ownership interest in such entity. Upon Landlord's written request, Tenant shall provide Landlord with written notice of any Transfer to a Tenant Affiliate, along with supporting documentation that the Transferee is a Tenant Affiliate. The public offering or sale of the equity of Tenant shall not be deemed an assignment or Transfer hereunder.

K.     Notwithstanding anything set forth in this Lease to the contrary, no transfer, assignment of sublease to an affiliate shall release Tenant or any guarantor from any liability or obligation under the Lease.

**ARTICLE IX**
**CONDUCT OF BUSINESS**

**Section 9.1     Opening Covenant**

A.     Tenant covenants and agrees to take possession of the Premises on the Possession Date and, subject to force majeure, timely complete Tenant's Work and open the Premises for business to the general public for one (1) day, under the trade name set forth in Section 1.13 fully fixtured, stocked and staffed within one (1) year following the Effective Date, subject to force majeure.

While Tenant's business is open to the general public, Tenant agrees to conduct its business at all times in a first class manner consistent with reputable business standards and practices of a first-class operation, and that it will at all times keep and maintain within and upon the Premises an adequate stock of merchandise and trade fixtures to service and supply the usual and ordinary demands and requirements of its customers and that it will keep the Premises in a neat, clean and orderly condition. Tenant shall not conduct any secondhand, auction, distress, fire, bankruptcy or going-out-of-business sales.

B.     Subject to Section 9.1.A above, Tenant shall be under no duty or obligation to continuously conduct its business in the Premises, provided that Tenant shall (i) otherwise perform and obey the other covenants and agreements contained in this Lease; and (ii) continue to dress and light Tenant's display windows so that the Premises appear to the public to be a store that is in operation, but closed for the day.

C.     Notwithstanding anything to the contrary contained in Section 9.1.B above, in the event Tenant fails to continuously conduct its business in the Premises for more than one hundred eighty (180) consecutive days (other than due to casualty, condemnation, Force Majeure, closings

27

for holidays and the taking of inventory when making repairs or alterations, or in connection with an approved or permitted assignment of this Lease or subletting of the Premises (each a "Permitted Closure")), Landlord shall have the option, as its sole remedy for such failure to continuously conduct its business in the Premises, to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant (but prior to Tenant recommencing operations or causing operations in the Premises), whereupon this Lease shall terminate upon the sixtieth (60th) day (the "Recapture Date") after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term. Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of the Lease. All rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.

### Section 9.2     Trade Name

Tenant agrees to conduct Tenant's business under the trade name as stated in Section 1.13 hereof, or such other trade name as Tenant may elect to use, subject to Section 1.13.

### Section 9.3     Tenant's Obligations

Tenant covenants and agrees that throughout the Term it shall: (i) keep the Premises, including the fixtures, displays, show windows, floors, and signs used by Tenant clean, neat, sanitary and safe and in good order, repair and condition (including all necessary replacements, painting and decorating), and shall keep all glass in doors, windows and elsewhere clean and in good condition and shall replace promptly all glass which may become damaged or broken with glass of the same quality, ordinary wear and tear and damage by fire or other casualty excepted; (ii) pay, before delinquent, any and all taxes, assessments, fines, penalties, and public charges imposed upon Tenant's business or fixtures; (iii) not use space outside the Premises or Basement Space for display, sale, storage, or any other similar undertaking; (iv) not use any advertising medium or sound devices inside the Premises that direct sound outside the Premises, or permit any objectionable odors to emanate from the Premises; (v) keep the Premises sufficiently heated to prevent freezing of water in pipes and fixtures in the Premises; (vi) keep the temperature within the Premises at such levels as may be required by any federal, state or local Law; (vii) install and maintain such fire protection devices in the Premises as are required by Law; and (viii) keep the Premises reasonably free from insects and vermin. Subject to applicable notice and cure periods, Tenant shall reimburse Landlord for any reasonable costs, penalties, fines, and reasonable attorneys' fees incurred by Landlord for any violations of Law caused by Tenant.

### ARTICLE X
### ENVIRONMENTAL MATTERS

A.        Tenant shall not use or knowingly permit the use of the Premises or any portion of the Building for any activities involving, directly or indirectly, the use, generation, treatment, storage, or disposal of any Hazardous Substances. As used herein, the term "Hazardous

28

Substances" shall mean any hazardous or toxic chemical, material, substance or waste, as those terms are defined by Laws regarding the environment ("Environmental Laws"), including but not limited to "hazardous substances" as defined under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) (42 U.S.C. §§ 9601 et seq.); "hazardous wastes" as defined under the Resource Conservation and Recovery Act (RCRA) (42 U.S.C. §§ 6901 et seq.); "toxic substances" as defined under the Toxic Substances Control Act (TSCA) (15 U.S.C. §§ 2601 et seq.), and any other hazardous or toxic chemical, material, substance, or waste, exposure to which is prohibited, limited, or regulated by any Federal, State, County, Regional or local authority, provided the foregoing provisions shall not prohibit the transportation to and from, and use, storage, maintenance and handling within, the Premises of substances customarily used in the business or activity permitted to be undertaken in the Premises as part of the Permitted Use in compliance with Environmental Laws.

B.      Tenant agrees to indemnify, defend, and hold Landlord harmless from and against any claims, losses, damages, actions, liabilities, causes of action, suits, investigations and judgments of any nature whatsoever, including, without limitation, reasonable attorneys' fees and costs of litigation, incurred by Landlord in connection with Tenant's breach of the provisions contained in Article X(A). The foregoing indemnity shall survive the expiration or earlier termination of this Lease.

C.      To the best of Landlord's knowledge, during Landlord's ownership of the Building, no Hazardous Substance has been released, discharged or disposed of on, under or about the Premises, Basements Space, or the Building by any entity or person, or from any source whatsoever. If any Hazardous Substances are hereafter discovered in the Premises or Basement Space, which are not caused by Tenant, its agents, employees or contractors, Landlord shall remove such Hazardous Substances and remediate (or cause a third party to remediate) such Hazardous Substance in compliance with Environmental Laws (the "Removal") as soon as practicable.      The Base Rent and Additional Rent shall be equitably adjusted (or the Commencement Date shall be postponed) if and to the extent any Hazardous Substances or Removal activity in, on, under or about the Premises, Basement Space or the Building (not caused by Tenant) materially and adversely affects Tenant's operations in the Premises or effective use of any Common Areas.   If such material and adverse interference shall continue for six (6) consecutive months, Tenant may terminate this Lease upon written notice to Landlord, which termination shall become effective sixty (60) days after such notice.   Landlord shall protect, defend, indemnify and hold harmless Tenant and its agents, officers, directors, contractors, employees, parents, subsidiaries, successors and assigns from and against any actual claims directly or indirectly related to: (a) a violation of or responsibility under Environmental Laws except that if such claims are directly related to Tenant's, or Tenant's agents, contractors or employees use, manufacture, storage, release or disposal of a Hazardous Substance on the Real Property; or (b) a breach of any representation, warranty, covenant or agreement by Landlord contained in this Article.  This indemnity shall survive the termination of this Lease for one (1) year.

## ARTICLE XI
## AMERICANS WITH DISABILITIES ACT

The parties hereto acknowledge that the Americans With Disabilities Act of 1990 (42 U.S.C. §12101 et seq.) and regulations and guidelines promulgated thereunder, as all of the same may be amended or supplemented from time to time (collectively referred to as "ADA") establish requirements for business operations, accessibility and barrier removal, and that such requirements may or may not apply to the Premises and the Building depending on, among other things: (a) whether Tenant's business is deemed a "public accommodation" or "commercial facility", (b) whether such requirements are "readily achievable", and (c) whether a given alteration affects a "primary function area" or triggers "path of travel" requirements. The parties hereby agree that: (i) Landlord shall be responsible for ADA Title III compliance in the Premises, including in the Common Areas, except as provided below; (ii) Tenant shall be responsible for ADA Title III compliance in the Premises, and with respect to any other leasehold improvements or work performed by Tenant in the Premises, and (iii) Landlord shall perform, or require that Tenant perform, and Tenant shall be responsible for the cost of, ADA Title III "path of travel" requirements in the event triggered by alterations in the Premises by Tenant. Tenant shall be solely responsible for requirements under Title I of the ADA relating to Tenant's employees. Notwithstanding anything to the contrary contained herein, with regard to the Mezzanine, Landlord does not make any representations or warranties, or have any obligations or responsibilities, with regard to compliance with the ADA.

## ARTICLE XII
## DEFAULT BY TENANT/LANDLORD

### Section 12.1    Tenant Default/Right to Reenter and Remedies

In the event of (a) any failure of Tenant to pay any Base Rent, Additional Rent or any other Rent for more than ten (10) days after it is past due, provided, however that with respect to one such failure in any twelve (12) month period only, no default shall be deemed to have occurred unless such failure continues to a period of five (5) days after Landlord delivers written notice thereof to Tenant, or (b) any failure to perform any other of the terms, conditions or covenants of this Lease to be observed or performed by Tenant for more than thirty (30) days after written notice of such default shall have been given to Tenant by Landlord, or such additional time as is reasonably required to correct such default provided Tenant has commenced to cure same within said thirty (30) day period and is diligently and in good faith pursuing same to completion, or (c) if Tenant or an agent of Tenant shall intentionally falsify any document required to be furnished to Landlord pursuant to the terms of this Lease, or (d) if Tenant or any guarantor of this Lease shall become insolvent, or file any debtor proceedings or take or have taken against Tenant or any guarantor in any court pursuant to any statute of any state a petition for reorganization or for the appointment of a receiver or trustee of all or a portion of Tenant's or any such guarantor's property, or (e) if Tenant or any guarantor makes an assignment for the benefit of creditors, or petitions for or enters into an agreement, or (f) if Tenant shall abandon the Premises, or suffer this Lease to be taken under any writ of execution, then Tenant shall be deemed to be in default of this Lease and Landlord, in addition to other rights or remedies it may have, shall have the immediate right to terminate (and mention in this Lease of any particular remedy shall not preclude Landlord from any other remedy at law, in equity or by statute) shall have the rights and remedies set forth in Section 12.2.  If Landlord terminates Tenant's right to possession of the Premises to the extent permitted under Section 12.2, Landlord may re-enter the Premises and may remove all persons and property from the Premises in accordance with all requirements of Law.  Such property may

be removed and stored in a public warehouse or elsewhere at the cost of, and for the account of, Tenant, all without service of notice (except as provided herein) and resort to legal process and without being deemed guilty of trespass or becoming liable for any loss or damage which may be occasioned thereby.

**Section 12.2    Tenant Default/Right to Relet**

A.    Should Tenant be in default as provided in Section 12.1 above beyond applicable notice and cure periods, and Landlord elects to reenter or should it take possession pursuant to legal proceedings, or should Tenant fail to cure a default (after expiration of the applicable notice period), Landlord may either terminate this Lease, or may, from time to time without terminating this Lease, make such alterations and repairs as may be necessary to return the Premises in order to relet the Premises, and relet the Premises or any part thereof for such term or terms (which may be for a term extending beyond the Term) at such rental or rentals and upon such other terms and conditions as Landlord, in its sole discretion may deem advisable.  Upon each such reletting, all rentals received by Landlord therefrom shall be applied:  first, to any indebtedness other than Rent due hereunder from Tenant to Landlord; second, to pay any costs and expenses of reletting, including Additional Rent, concessions or abatements, brokers' fees and attorneys' fees, and of costs of the aforesaid alterations and repairs; third, to the payment of Rent due and unpaid hereunder; and the residue, if any, shall be held by Landlord and applied in payment of future Rent as the same may become due and payable hereunder.  If such rentals received from such reletting during any month shall be less than that to be paid during that month by Tenant hereunder, Tenant shall pay any such deficiency to Landlord.  Such deficiency shall be calculated and paid monthly. No such reentry or taking possession of the Premises by Landlord shall be construed as an election on its part to terminate this Lease unless a written notice of such intention be given to Tenant or unless the termination thereof be decreed by a court of competent jurisdiction.  If Landlord does not terminate this Lease, Landlord should be entitled to continue to recover from Tenant any Rent payable under the terms of this Lease but for concessions or abatements previously granted by Landlord to Tenant. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach.

Should Landlord at any time terminate this Lease for any breach, in addition to any other remedies it may have, it may recover from Tenant all damages it may incur by reason of such breach, including unamortized Landlord's Contribution to Tenant's Work, leasing commissions, the cost of recovering the Premises, reasonable attorneys' fees, and including the worth at the time of such termination of the excess, if any, of the amount of Rent reserved in this Lease for the remainder of the Lease Term over the then reasonable rental value of the Premises for the remainder of the Lease Term, all of which amounts shall be immediately due and payable from Tenant to Landlord.

In the event of a breach by Tenant of any of the covenants or provisions hereof, Landlord shall have the right to seek an injunction and the right to invoke any remedy allowed at law or in equity as if re-entry, summary proceedings and other remedies were not provided for herein.

Mention in this Lease of any particular remedy shall not preclude Landlord from any other remedy at law, in equity or by statute.  Tenant hereby acknowledges that Landlord shall have the right to exercise any remedy available to it under this Lease, at law, in equity or by statute and

31

unless clearly stated to the contrary in this Lease, no right or remedy conferred upon or reserved to the Landlord under this Lease is intended to be exclusive of any other right or remedy given herein or now or hereinafter existing at law, in equity or by statute.

B.    Landlord shall use reasonable efforts to mitigate its damages and shall comply with Illinois law with respect thereto.

### Section 12.3   Legal Expenses

In the event either party hereto shall commence an action or proceeding seeking to enforce a covenant or condition of this Lease, the prevailing party shall collect from the non-prevailing party all reasonable costs and expenses incident to either the prosecution or defense of said action or proceeding, including reasonable attorneys' fees.  If either party becomes a party to any litigation concerning this Lease, the Premises or the Building by reason of any act or omission of the other party or its authorized representatives, and not by its own act or omission or that of its authorized representatives, the other party shall be liable to that party for reasonable attorneys' fees, court costs, investigation expenses, discovery costs and costs of appeal incurred by it in the litigation.

### Section 12.4   Landlord Default

Landlord shall be deemed in default in the performance of its obligations under this Lease if Landlord shall have failed to perform such obligation within thirty (30) days after written notice by Tenant to Landlord (with a copy to any Mortgagee pursuant to Section 23.3 hereof) stating with specificity the nature of Landlord's failure to perform such obligation, or such additional time as is reasonably required to correct such default, provided Landlord has commenced to cure same within said thirty (30) day period and is diligently pursuing same to completion. In the event of a Landlord default, Tenant shall be entitled to exercise all rights and remedies available to it under this Lease, at law or in equity.

### Section 12.5   Other Damages

Notwithstanding anything to the contrary contained in this Lease, in no event will Landlord or Tenant be entitled to seek or receive any indirect, consequential, punitive or special damages.

### ARTICLE XIII
### INSURANCE

### Section 13.1   By Landlord

A.    Landlord shall carry Commercial General Liability insurance on the Building and Common Areas providing coverage for not less than Two Million Dollars and 00/100 ($2,000,000) against liability for bodily injury, personal injury or death, property damage or destruction (including loss of use thereof) per occurrence arising out of or in connection with (a) Landlord's activities upon, in or about the Premises or Basement Space; or (b) the use or occupancy of the Building.

32

B.      Landlord shall carry Special Causes of Loss Insurance on the Building and all improvements owned by Landlord in the Building and Common Areas (excluding Tenant's merchandise, trade fixtures, furnishings, equipment, personal property, plate glass or betterments placed there by Tenant at Tenant's cost) for the full insurable value thereof, with such other coverages and such reasonable deductibles as Landlord deems advisable.

C.      The cost of insurance premiums for Landlord's insurance obtained by Landlord shall be included in Expenses.  Landlord's insurance shall be obtained from an insurance company rated at least A-VIII or better in Best's Insurance Reports.

### Section 13.2    By Tenant

Tenant agrees to carry Commercial General Liability insurance on the Premises during the Term hereof, covering the Tenant and naming the Landlord, Landlord's mortgagee, Landlord's managing agent of the Building, and such other parties as requested by Landlord as additional insureds with companies which have an "A.M. Best's rating of A-VII" or higher for limits of not less than Two Million and 00/100 Dollars ($2,000,000) for bodily injury, including death, and personal injury for any one occurrence, One Million and 00/100 Dollars ($1,000,000) property damage insurance or combined single limit of Two Million and 00/100 Dollars ($2,000,000). Tenant shall also carry contractual liability coverage recognizing this Lease, products and/or completed operations liability and Tenant shall give Landlord a minimum of ten (10) days' written notice prior to cancellation or termination of such insurance.  Tenant also agrees to carry insurance against fire, and such other risks as are from time to time included in a Special Causes of Loss Insurance, for the full insurable value covering Tenant's Work, all of Tenant's betterments, Tenant's merchandise, trade fixtures, furnishings, wall coverings, plate glass, floor coverings, carpeting, drapes, equipment and all items of personal property of Tenant located on or within the Premises; worker's compensation insurance in accordance with the Laws of the State of Illinois; and employer's liability insurance to the limit of no less than $300,000.00. At the Possession Date, Tenant shall provide Landlord with copies of certificates evidencing that such insurance is in full force and effect and stating the limits thereof.  The minimum limits of the commercial general liability policy of insurance shall in no way limit or diminish Tenant's liability under Section 13.4 hereof.  Once every five (5) years of the Lease, Tenant's insurance obligations shall be subject to increase, additional and/or different types of insurance at any time, and from time to time, during the Term hereof if Landlord, in the exercise of its reasonable judgment, shall deem necessary for adequate protection and such increases or changes are consistent with other first class properties in the vicinity of the Building.  Within twenty (20) days after demand therefor by Landlord, Tenant shall furnish Landlord with evidence that such demand has been complied with.

### Section 13.3    Increase in Fire Insurance Premium

Tenant agrees that it will not keep, use, sell or offer for sale in or upon the Premises any article which may be prohibited by the fire insurance policy required to be carried by Tenant. Tenant agrees to pay any increase in premium for fire and extended coverage or other insurance that may be charged during the Lease Term on the amount of such insurance which may be carried by Landlord on the Premises or the Building resulting from the type of merchandise sold by Tenant in the Premises, whether or not Landlord has consented to the same.  In determining whether increased premiums are the result of Tenant's use of the Premises, a schedule, issued by the

33

organization making the insurance rate on the Premises showing the various components of such rate, shall be conclusive evidence of the several items and charges which make up the fire insurance rate on the Premises. In the event Tenant's occupancy causes any increase of premium for the commercial general liability, casualty and other peril insurance rates on the Premises or Building or any part thereof above the rate for the least hazardous type of occupancy legally permitted in the Premises, Tenant shall pay the additional premium on such insurance policies by reason thereof. Bills for such additional premiums shall be rendered by Landlord to Tenant at such times as Landlord may elect, and shall be due from Tenant when rendered and the amount thereof shall be deemed to be, and paid as Additional Rent. Tenant may maintain the insurance required hereunder by means of a blanket policy.

### Section 13.4   Mutual Indemnification

A. To the extent permitted by Law and except to the extent caused by Landlord's negligence or willful misconduct, breach of this Lease or violation of Law, Tenant shall indemnify and forever save harmless Landlord, its agents and employees from and against any and all third party personal injury and third party personal property liabilities, liens, claims, demands, damages, expenses, attorneys' fees, costs, suits, proceedings, actions and causes of action of any and every kind and nature arising or growing out of, or in any way connected with, Tenant's use, occupancy, management or control of the Premises, or Tenant's conduct or activities in, or arising out of Tenant's, its agents', employees' or contractors' negligence or willful misconduct in the remainder of the Building or Common Area, or any part thereof, or occasioned wholly or in part by any act or omission by Tenant, its invitees, agents, contractors, employees, or servants. This indemnity shall survive termination of this Lease only as to claims arising out of events that occur prior to termination of the Lease.

B. To the extent permitted by Law, except to the extent caused by Tenant's negligence, willful misconduct, breach of this Lease or violation of Law, Landlord shall defend, indemnify and forever save harmless Tenant, and their members, directors, officers, agents and employees, from and against any and all third party personal injury and third party personal property liabilities, liens, claims, demands, damages, expenses, attorneys' fees, costs, suits, proceedings, actions and causes of action of any and every kind and nature arising or growing out of, or in any way connected with, Landlord's management or control of the Building or Common Area or any part thereof, or Landlord's conduct or activities in the Premises, or Landlord's its agents', employees' or contractors' negligence or willful misconduct, or occasioned wholly or in part by any act or omission of Landlord, its invitees, agents, contractors, employees or servants. This indemnity shall survive termination of this Lease only as to claims arising out of events that occur prior to termination of the Lease.

**Section 13.5   Release and Waiver of Subrogation.** Landlord and Tenant (each a "Waiving Party") each hereby releases the other from any liability for damage or destruction to the Premises, whether or not caused by acts or omissions of the Waiving Party, its employees or agents, and hereby releases and waives any and all claims and right of recovery and/or any right of subrogation against the other party or its employees for damage, loss or inquiry caused by or resulting from fire and/or other perils, to the extent that any such claims for damages, losses or injuries are or would be covered by an special form property insurance policies that such party does or is required to maintain hereunder. Each Waiving Party shall look to its respective insurance coverage, without

regard to deductibles, for recovery of any insured property damage. Each of Landlord and Tenant shall cause any special form properly insurance policies that it maintains to obtain a provision whereby the insurer waives any (a) rights of subrogation, and (b) rights of recovery against the other party. Both Landlord and Tenant agree to immediately give each instance company that has issued to it policies of special form property insurance written notice of the terms of such mutual waivers and to cause such insurance policies to promptly endorsed, if necessary, to prevent the invalidation thereof by reason of such waivers and shall furnish to the other party a certificate of insurance or other written evidence of such endorsement or that such endorsement is not required.

## ARTICLE XIV
## NO PERSONAL LIABILITY OF LANDLORD

"Landlord", as used in this Lease insofar as covenants or obligations on the part of Landlord are concerned, shall be limited to mean and include only the owner or owners of the Building at the time in question. In the event of any transfer of title, the grantee shall automatically be deemed to assume all liability to the performance of any covenants or obligations on the part of Landlord contained in this Lease thereafter to be performed and Landlord named herein shall automatically be freed and relieved from and after the date of such transfer of conveyance of all liability with respect to the performance of any covenants or obligations on the part of Landlord contained in this Lease thereafter to be performed, provided that any funds in the hands of such Landlord at the time of such transfer shall be turned over to the grantee. Tenant shall look solely to the estate or interest of Landlord in the Building including the rents, profits, proceeds and income thereon, and any proceeds from a sale thereof, to the extent permitted by law, for the satisfaction of Tenant's remedies for collection of a judgment or other judicial process requiring the payment of money by Landlord in the event of any default or breach by Landlord of any of the terms, covenants and conditions of Lease to be observed and/or performed by Landlord, and no other property or assets of Landlord, its partners or agents shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies.

## ARTICLE XV
## ACCESS TO PREMISES

Landlord, its agents, representatives and designees shall have the right to enter the Premises during normal business hours upon at least seventy-two (72) hours' advance notice (except in case of apparent emergency, when only notice that is reasonable under the circumstances is required) to examine and inspect the same, and/or to perform such maintenance or repairs of the Premises or the Building, or alterations or additions to the Building (other than the Premises), as Landlord may deem necessary or proper for the safety, improvement or preservation of the Premises or the Building; provided that during such access Landlord agrees to use reasonable efforts not to unreasonably interfere with the Tenant's operation of its business and shall diligently prosecute to completion any such maintenance and repairs. Landlord shall also have the right to enter the Premises upon at least seventy-two (72) hours' prior notice during Tenant's regular business hours, to exhibit same to prospective purchasers, tenants (but only during the last nine (9) months of the Term) or mortgagees; provided that during such access, Landlord agrees to use reasonable efforts not to unreasonably interfere with the Tenant's operation of its business. Landlord's right to enter the Premises to make repairs, alterations or additions shall extend only to repairs, alterations or additions which Landlord is required to make under this Lease, under any mortgage on the

35

Building or in accordance with the applicable legal requirements. If as a result of Landlord's repairs, alterations or additions, or entry upon the Premises Tenant experiences any material, adverse, and unreasonable interruption or interference that continues for twenty-four (24) or more consecutive hours, Rent shall thereafter equitably abate to the extent of such interruption or interference for each day or portion thereof that such interruption or interface continues. Notwithstanding anything in this Lease to the contrary, when entering or performing any repair or other work in the Premises, Landlord, its agents, employees and/or contractors (a) shall identify themselves to Tenant's personnel immediately upon entering the Premises, and (b) shall conduct themselves in a manner that does not interrupt or interfere with Tenant's use, business or operations on the Premises or obstruct the visibility of or access to the Premises.

## ARTICLE XVI
## TENANT ALTERATIONS

A.    Tenant shall not make any structural alterations or mechanical alterations in any portion of the Premises (unless such mechanicals serve the Premises exclusively), nor make any alterations to the exterior of the Premises (excluding non-structural portions of the storefront of the Premises), without first obtaining the written consent of Landlord, which consent may be withheld in Landlord's sole discretion. Tenant shall not make any interior alterations at the cost in excess of One Hundred Thousand Dollars ($100,000.00) in any one Lease Year, mechanical alterations serving the Premises exclusively, or alterations to the non-structural portions of the storefront of the Premises, without first obtaining the written consent of Landlord, which consent will not be unreasonably withheld, conditioned or delayed. Any interior alterations that do not require Landlord's consent shall be subject to the following conditions: (i) such alterations shall not affect the mechanical, electrical, plumbing or utility systems in the Premises or in any other tenant space; (ii) Tenant shall deliver not less than fifteen (15) days' prior written notice to Landlord of such proposed alterations specifying in detail the nature thereof, and (iii) any such alterations shall comply with all applicable provisions of this Lease. All alterations, additions and improvements provided for herein shall become, upon completion, the property of Landlord subject to the terms of this Lease; provided that Landlord shall have the right to require that Tenant, upon the expiration or earlier termination of this Lease, remove all alterations, additions and improvements and any other property placed in the Premises by Tenant in violation of the Lease. In such event, Tenant shall be responsible for any damage caused by such removal. Notwithstanding anything to the contrary contained herein, Tenant may not penetrate the floor of the Premises without Landlord's approval and if approved, Tenant shall cause such penetrations to be made in compliance with Landlord's approval and specifications.

B.    Landlord shall respond to all requests by Tenant for consent to any Tenant's alterations to the Premises ("Alterations") proposed by Tenant within ten (10) business days of receipt of a request describing in reasonable detail the proposed Alteration. If Landlord fails to respond within such ten (10) business day period, Tenant may deliver a second request with a conspicuous notice that failure to respond will result in a deemed approval, and if Landlord does not respond to the second request within seven days, Landlord shall be deemed to have approved Tenant's request. In no event shall Tenant or Tenant's agents (including its general contractor and subcontractors) be required to post any type of security or performance bond or other security in connection with Alterations or other work at the Building. Tenant shall have the right to select the contractors and subcontractors of its choice for Tenant's Work and Alterations, subject to

36

Landlord's right to review or approve Tenant's general contractor. Tenant and Tenant's agents shall not be required to pay or reimburse Landlord or Landlord's agents for any other costs in connection with the review or approval of Tenant's work, including Alterations, or any plans relating thereto.

## ARTICLE XVII
## REPAIRS AND MAINTENANCE

### Section 17.1    Landlord's Obligations.

A.      Subject to Sections 17.1.C., and 17.1.D, Landlord shall keep or cause to be kept, at Landlord's sole cost and expense (except to the extent permitted to be included in Expenses) the Building and Common Areas, and the roof system, roof membrane, gutters, downspouts, foundations, floor slab, footings, flashings, sprinkler systems, and structural portions of the walls of the Premises and Basement Space in good order, repair and condition, and make all necessary replacements, and keep the Building and the Common Area in compliance with all Laws with respect to the operation and condition thereof (except to extent expressly required of Tenant with regard to the Premises in Section 17.2), remove all papers, debris, snow, ice, filth and refuse from the Common Areas, including to the curbs of all sidewalks, alleys, loading areas, trash areas, and public areas immediately adjoining the Building, to keep them in a neat, clean and orderly condition, and maintain all landscaped areas (including making such replacements of shrubs and other landscaping as is necessary, and keeping the areas at all times adequately weeded, fertilized and watered). Tenant shall pay for any citations issued by the City for Tenant's noncompliance. Landlord shall also keep in good order, condition and repair (including all replacements), all drainage systems, electrical, plumbing, HVAC, and other utility systems, equipment and appurtenances up to the point of connection within the Premises or Basement Space, and all lines and conduits passing through the Premises or Basement Space and serving others. This Section shall not apply in case of damage or destruction by fire or other casualty or condemnation or eminent domain, in which shall be controlled by Articles XIX and XX. Except as provided in this Section 17.1, Landlord shall not be obligated to make any other repairs, replacements or improvements of any kind upon the Premises, or to any equipment, merchandise, stock in trade, facilities or fixtures therein, all of which shall be Tenant's responsibility, but Tenant shall give Landlord written notice of any repair required to be performed by Landlord in the Premises and of which Tenant has actual knowledge. If Landlord fails to make repairs to the Premises (or to the Common Areas that materially and adversely affect Tenant's use or operations or materially and adversely affect the visual image of the Premises) within thirty (30) days after the receipt of Tenant's written notice, force majeure excepted, unless the nature of Landlord's obligation is such that more than thirty (30) days are required for its performance and Landlord commences performance within the thirty (30) day period and thereafter diligently pursues the cure to completion, Tenant may, at its option, make such repair or replacement and deduct the costs thereof from the installments of Rent next falling due.

B.      Landlord's maintenance, repair and replacement activities shall be at a level substantially similar to the level of maintenance, repair and replacement standards that are typical in other similar first-class properties that are located in the market in which the Premises are located. Landlord shall and does hereby assign to Tenant all assignable warranties and guarantees received in connection with Landlord's work that relate to those components of the Premises that

37

are the obligation of Tenant to repair and maintain. Landlord shall use commercially reasonable efforts to enforce any non-assignable warranties and guarantees at Tenant's request on behalf of Tenant. Tenant shall be entitled to enforce any warranty relating to the Premises if Landlord fails to do so within a reasonable time after written notice from Tenant requesting enforcement. With respect to any Landlord repair and maintenance work performed by Landlord as provided in this Section, Landlord shall use commercially reasonable efforts not to interfere with Tenant's use of the Premises, perform such work in a good and workmanlike manner, in compliance with all safety and other Law, and diligently prosecute such work to completion (including the restoration of any Alterations or Tenant's property that were disturbed by Landlord to complete such work). Landlord shall bear the full cost of any repair or replacement to any part of the Premises that result from damage caused by the negligence or willful misconduct of Landlord, its agents, employees and contractors.

C.      Notwithstanding anything to the contrary contained herein, Tenant shall be liable for the costs of any damage or repairs related to the matters described in Section 17.1 that are necessitated by a negligent act or willful misconduct of Tenant, its agents, employees, contractors or invitees.

D.      Notwithstanding anything to the contrary contained herein, (i) Tenant shall be required to construct, install and complete the Exhibit "J" Work; and (ii) Landlord shall not be liable for, or obligated to repair, any defective work performed by or on behalf of Tenant, which Landlord is otherwise to repair pursuant to this Section 17.1.

E.      Landlord shall have no obligations with respect to the Basement Space except as expressly provided herein.

### Section 17.2   Tenant's Obligations

A.      Tenant, at Tenant's cost, shall at all times maintain, repair and replace the Mezzanine, and the non-structural interior portions of the Premises (including all entrances and vestibules) and all partitions, windows and window frames and moldings, plate glass, Tenant's signs, glass, doors, door openers, and fixtures installed by Tenant, and lighting, electrical, plumbing, heating, ventilating and air conditioning fixtures and systems ("HVAC"), and other mechanical, electrical or plumbing systems and equipment within and serving the Premises or the Basement Space exclusively, and all parts of the Premises and Basement Space not otherwise required to be maintained by Landlord, in good order and condition, clean, orderly, sanitary and safe, damage by unavoidable casualty excepted, including, but not limited to, doing such things, at Tenant's sole cost and expense, as are necessary to cause the Premises to comply with applicable Laws, (other than those portions of the Premises which Landlord is required to maintain pursuant to Section 17.1, which shall be Landlord's obligation), which are now in force or which may hereafter be in force, which shall impose any duty upon Landlord or Tenant with respect to the use, occupation or alteration of the Premises. This Section shall not apply in case of damage or destruction by fire or other casualty or condemnation or eminent domain, in which event the obligations of Landlord and Tenant with respect to the Premises shall be in accordance with Articles XIX and XX.

If replacement of equipment, fixtures, units, systems and appurtenances thereto are necessary, Tenant shall replace the same with equipment, fixtures, units, systems and appurtenances of the same quality, and shall repair all damages caused by such replacement.

B.      If Tenant refuses or neglects to make repairs and/or maintain the Premises or any part thereof as required pursuant to Section 17.2(A) within ten (10) days after written notice thereof by Landlord to Tenant, (no notice is required in the event of an emergency), Landlord shall have the right, but not the obligation, to make such repairs on behalf of and at Tenant's cost.

C.      Tenant, at Tenant's cost, shall be responsible to construct the Exhibit "J" Work described herein and repair any defective work it causes pursuant to completion of the Exhibit "J" Work.

## ARTICLE XVIII
## LIENS

A.      Tenant will not create, permit to be created, or to remain, and will discharge, any lien (including, but not limited to, the liens of mechanics, laborers or materialmen for work or materials alleged to be done or furnished in connection with the Premises), encumbrance or other charge upon the Premises or any part thereof, and upon Tenant's leasehold interest therein and performed by or through Tenant or its subtenants or assignees or agents, provided that Tenant shall not be required to discharge any such liens, encumbrances or charges as may be placed upon the Premises by the act of Landlord.

B.      If any lien is placed upon the Premises or the Building as a result of any work done, or materials furnished to, on behalf of Tenant or its subtenants, assignees or agents, or as a result of any goods or services sold or rendered by Tenant, then Tenant shall, within thirty (30) days of the imposition of the lien, cause said lien to be released of record, or insured or bonded over, at Tenant's sole expense, to Landlord's reasonable satisfaction.

C.      Tenant shall indemnify and forever save harmless Landlord, its agents and employees from and against any and all liabilities, liens, claims, demands, damages, expenses, attorneys' fees, costs, suits, proceedings, actions and causes of action of any and every kind and nature arising or growing out of, or in any way connected with, any work done, or materials furnished to, on behalf of Tenant, its successors, assigns and subtenants, or as a result of any goods or services sold or rendered to Tenant, its successors, assigns and subtenants, in the Premises or the Building. In case Landlord shall be made a party to any litigation commenced against Tenant, its successors, assigns and subtenants, regarding same, then Tenant shall protect and forever hold Landlord, its agents and employees harmless and shall pay all costs, expenses and reasonable attorneys' fees incurred or paid by Landlord in connection with such litigation.

## ARTICLE XIX
## DESTRUCTION OF PREMISES

### Section 19.1   Fire, Explosion or Other Casualty

A.      In the event the Premises are damaged by fire, explosion or any other casualty, to an extent which is less than fifty percent (50%) of the cost of replacement of the Premises, the

#3104972v10

damage, except as is otherwise provided in this Article XIX, shall promptly be repaired by Landlord at Landlord's expense, provided that Landlord shall not be obligated to expend for such amount in excess of the insurance proceeds recovered (and the applicable deductible) as a result of such damage and that in no event shall Landlord be required to repair or replace Tenant's Work or betterments, Tenant's stock in trade, fixtures, furniture, furnishings, floor coverings, equipment or plate glass. In the event of any such damage and (a) Landlord is not required to repair as hereinabove provided; and (b) are damaged to the extent of fifty percent (50%) or more of the cost of replacement; (c) the Building or the Common Area are damaged to the extent of twenty-five percent (25%) or more of the cost of replacement, Landlord may elect either to repair or rebuild the Premises or the Building or to terminate this Lease upon giving notice of such election in writing to Tenant within ninety (90) days after the occurrence of the event causing the damage. If the casualty, repairing or rebuilding to the Premises, shall render the Premises unusable for the Permitted Use, in whole or in part, a proportionate abatement of Base Rent and Additional Rent shall be allowed from the date when the damage occurred until the earlier of (i) the date Tenant can again operate for business in the Premises; or (ii) one hundred twenty (120) days after Landlord substantially completes it work, said proportion to be computed on the basis of the relation which the gross square foot area of the space rendered untenantable bears to the square footage of the Premises.

B.     In the event that Landlord is required, or elects, to rebuild as provided for above and fails to restore the Building and Premises to a condition of like kind and utility within 270 days following the casualty, then Tenant shall have the right to terminate this Lease upon giving the Landlord at least thirty (30) days' written notice of such election, which notice must be given no earlier than 270 days after the occurrence of the event causing the damage, and no later than 365 days after the occurrence of the event causing the damage. If Landlord fails to substantially complete such rebuilding before the expiration of said thirty (30) days, then this Lease shall terminate as of the thirtieth (30th) day and neither party shall have any obligation to the other hereunder. Notwithstanding the foregoing, Tenant may also terminate this Lease if the damage or destruction is caused by a peril not required to be insured against hereunder or if Premises are damaged during the last one (1) year of the Term, the damage materially affects Tenant's ability to conduct business from the Premises, and it will take more than sixty (60) days to repair such damage.

### Section 19.2    Repair of Landlord's and Tenant's Work

The provisions of this Article XIX with respect to repair by Landlord shall be limited to such repair as is necessary to place the Premises in the condition that existed on the Possession Date, and when placed in such condition, the Premises shall be deemed restored to the extent required by Landlord. If Tenant elects to re-open the Premises for business, then within one hundred twenty (120) days after the date Landlord substantially completes its work, (which shall commence after Landlord has delivered the Premises to Tenant with Landlord's restoration work substantially completed, Tenant, at Tenant's expense, shall, subject to Force Majeure, complete Tenant's Work, replace its stock in trade, fixtures, furniture, furnishings, floor coverings, equipment and plate glass, and, if Tenant has closed, Tenant shall reopen for business.

### Section 19.3   Determination of Damage

If all or any part of the Premises, the Building or Common Area is destroyed or damaged as set forth in Section 19.1, an architect designated by Landlord shall determine the extent of the destruction or damage and provide Landlord with a certificate attesting to the condition of the Premises, Common Area or the Building, as the case may be.

## ARTICLE XX
## CONDEMNATION

If the Premises shall be taken by right of eminent domain, in whole or in material part, for public purposes or shall be sold by Landlord under the threat of the exercise of such power ("Condemnation"), then this Lease, at the option of Landlord shall terminate and all Base Rent and Additional Rent shall be properly apportioned to the date of such taking.  The party who receives the condemnor's notice of intention to take shall immediately give a copy of such notice to the other party.  Landlord shall receive the entire award for the lands and improvements so taken, or the entire amount of any payment made under the threat of the exercise of power of eminent domain, except that Tenant shall be entitled to receive from the condemning authority any separate award, if any, to compensate Tenant for the loss of Tenant's fixtures and equipment and moving expenses, and Tenant shall be allowed to assert its claim for losses, including loss of Tenant's improvements; provided Tenant shall not otherwise assert a claim for loss of the leasehold estate. If the Lease is not terminated as provided above, Landlord, at its sole expense, shall promptly restore and reconstruct the Premises to a complete unit of like quality, character and utility for Tenant's purposes as existed prior to the condemnation, provided such restoration and reconstruction shall make the same reasonably suitable for the Permitted Use, but in no event shall Landlord be required to expend any amount greater than the amount received by Landlord as compensation for the portion of the Premises taken by the condemnor.  Tenant's rental obligations, and during the unexpired portion of this Lease shall be adjusted proportionately to reflect the usable area remaining in the Premises, as of the date on which the condemning authority takes title or possession.  Notwithstanding anything contained herein to the contrary, if, in Landlord's determination, any significant portion of the Building shall be taken by the exercise, or under the threat of the exercise of, the power of eminent domain, Landlord may, by notice in writing to the Tenant delivered on or before the day of surrendering possession to the public authority, terminate this Lease and Rent shall be paid or refunded as of the date of termination.  In addition, if in Tenant's reasonable determination, any significant portion of the Premises is taken by Condemnation, Tenant may by notice in writing to the Landlord delivered on or before the day of surrendering of possession to the public authority, terminate the Lease and Rent shall be paid or refunded as of the date of termination.  Notwithstanding anything contained herein to the contrary, if the restoration of the Premises or the Building is not commenced within thirty (30) days of Landlord's receipt of the condemnation award or is not completed within one hundred eighty (180) days from the date of Condemnation, Force Majeure excepted then Tenant may terminate this Lease at any time before Landlord completes the restoration.

## ARTICLE XXI
## FORCE MAJEURE

41

In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, inability to procure materials, loss of utility services, restrictive governmental laws or regulations, riots, insurrection, war, acts of God, or other reason not within the reasonable control of, and not the fault of, the party delayed in performing work or doing acts required under the terms of this Lease ("Force Majeure"), then performance of any such act shall be extended for a period equivalent to the period of such delay. The provisions of this Article shall not operate to excuse any party from the prompt payment of any monetary obligations under this Lease. Delays or failures to perform resulting from lack of funds or changed economic conditions shall not be deemed Force Majeure.

**ARTICLE XXII**
**Intentionally Deleted**

**ARTICLE XXIII**
**SUBORDINATION AND ATTORNMENT**

**Section 23.1     Attornment.**

Tenant shall attorn and be bound to any of Landlord's successors under all the terms, covenants and conditions of this Lease for the balance of the remaining Term.

**Section 23.2     Subordination**

A.     This Lease is subject and subordinate to the liens of any mortgages or any lien resulting from any method of financing or refinancing (hereinafter collectively referred to as "Mortgage") now or hereafter existing or recorded against all or any part of the Building, and to all renewals, modifications, replacements, consolidations and extensions thereof. This Section shall be self-operative and no further instrument of subordination shall be required; provided that upon request, Tenant shall execute and deliver any documents requested by any such mortgagee or security holder and in form reasonably acceptable to the parties thereto, provided such mortgagee or security holder agrees in writing with Tenant not to disturb Tenant's possession while Tenant is not in default hereunder. The foregoing notwithstanding any mortgagee or beneficiary may at its option subordinate such Mortgage, or other financing instrument to this Lease.

B.     Concurrently with the execution of this Lease, Landlord, Landlord's lender and Tenant shall execute and deliver to Tenant the Subordination, Non-disturbance and Attornment Agreement, in substantially the form as attached hereto as Exhibit "G" and made a part hereof.

**Section 23.3   Mortgagee's Notice and Right to Cure**.

Tenant shall send by registered or certified mail to any Mortgagee that shall have notified Tenant in writing that it is the holder of a lien upon the Building, a copy of any notice of default sent by Tenant to Landlord. If Landlord fails to cure such default within the time period provided under this Lease, but the Mortgagee begins such cure within ten (10) days after such period expires and proceeds diligently to cure same, then Mortgagee shall have such additional time as is necessary to complete such cure, including any time necessary to obtain possession if possession is necessary to cure, and Tenant shall not begin to enforce its remedies so long as the cure is being

diligently pursued.

**Section 23.4    Estoppel Certificate**.

Within fifteen (15) days after request therefor by either party the other party shall execute and deliver to the requesting party a written certification stating that this Lease is unmodified and in full force and effect (or if modified, that the same is in full force and effect as modified, and stating the modifications), that there are no defenses or offsets thereto (or stating those claimed by such party), the dates to which Base Rent, and Additional Rent have been paid, and such other matters related to this Lease as such party shall reasonably request.

## ARTICLE XXIV
## SURRENDER OF PREMISES

**Section 24.1    Surrender of Premises**

A.    At the expiration or earlier termination of this Lease (or Tenant's right of possession of the Premises), Tenant shall surrender the Premises to Landlord broom clean and in good repair and condition, reasonable wear and tear and casualty excepted.  Tenant shall promptly repair any damage to the Premises caused by the removal of any furniture, trade fixtures or other personal property placed by Tenant in the Premises and Tenant's obligations hereunder shall survive the expiration or sooner termination of this Lease.   Tenant shall not be required to remove any improvements at any time including upon the expiration of this Lease, unless Landlord has requested such removal at the time the improvements were made.  Tenant shall, at its expense, "de-identify" the Premises by removing items indicative of Tenant's trademarks, trade names, or trade dress (or other intellectual property rights), as Tenant reasonably believes necessary or appropriate for the protection of Tenant's interest in Tenant's trademarks, trade names, trade dress copyrights (or other intellectual property rights), or as Landlord reasonably requests and Tenant shall repair any damage to the Premises caused by such removal, which repair shall include the patching and filling of holes.  In no event shall Tenant remove or be required to remove any restrooms, walls, flooring, ceilings, utility or electrical components located inside the walls or HVAC systems.

B.    If requested by Landlord, Tenant shall be obligated to remove any improvements in the Premises which were made in violation of the Lease.  If Tenant has not removed all Tenant's property prior to the Expiration Date or earlier termination of this Lease, then such items shall, at Landlord's option, become Landlord's property, or Landlord may remove same from the Premises and store same at Tenant's reasonable expense, and Landlord shall promptly give Tenant notice of the location of same.  The provisions of this Section shall survive the end of the Term.

**Section 24.2    Hold Over**

If Tenant holds over and remains in possession of the Premises or any part thereof beyond the end of the Term or the sooner termination of the Term of this Lease or Tenant's right to possession hereunder, Tenant shall be deemed to hold the Premises as a tenant at sufferance, subject to all of the terms, conditions, and covenants of this Lease (which shall be applicable during the holdover period), except that Tenant shall pay Landlord for such holdover period an amount

43

equal to one hundred fifty percent (150%) of the monthly installments of Base Rent payable at the time of such expiration or earlier termination, plus 100% of all Additional Rent. In addition thereto, Tenant shall be liable to Landlord for any and all damages which Landlord shall suffer by reason thereof, and Tenant will indemnify Landlord against all claims and demands made by any succeeding tenants (or potential tenants) against Landlord, founded upon delay by Landlord in delivering possession of the Premises to such succeeding Tenant. The parties agree that Landlord's actual damages as a result of Tenant's holdover would be extremely difficult or impracticable to determine, and acknowledge that the amounts to be paid as described in this Section 24.2 have been agreed to, after negotiation, and are not a penalty. Rent payable during the holdover period shall be computed on a monthly basis and shall not be prorated on a per diem basis if Tenant shall hold over for less than a full month. Notwithstanding the foregoing provision, no holding over by Tenant pursuant to this Section 24.2 shall operate to extend this Lease. The provisions of this Section 24.2 do not waive Landlord's right of re-entry or right to regain possession by actions at law or in equity or by any other rights hereunder.

## ARTICLE XXV
## SIGNS, AWNINGS, CANOPIES

A.      Tenant will not place or permit on any exterior door, window or exterior wall of the Premises any sign, awning, canopy, advertising matter, decoration, or lettering ("Sign") which does not comply with the requirements set forth for Tenant's signs in Exhibit D and as otherwise provided herein. In the event Tenant installs any signage in violation of this Lease, the Landlord shall have the right to remove the same after giving Tenant five (5) days' prior written notice.

B.      Prior to erecting the same, Tenant shall submit to Landlord a rendering of Tenant's proposed Sign, which Landlord shall have the right to approve, consistent with the requirements set forth in Exhibit D, which approval shall not be unreasonably withheld or delayed. If Landlord fails to respond to Tenant's request for approval of such Signs requiring Landlord's approval within fifteen (15) days after Tenant submits same to Landlord, then Tenant may deliver a second request with a conspicuous notice that failure to respond will result in a deemed approval, and if Landlord does not respond to the second request within ten (10) business days, Landlord shall be deemed to have approved such Signs. Notwithstanding anything to the contrary, all signs must comply with all applicable laws, regardless of approval of Landlord. Landlord hereby approves, for appearance only, Tenant's logo, colors, fonts, trademarks, and lettering, as shown of attached Exhibit "K," which shall be subject to compliance with all Laws and other applicable provisions of this Lease. Tenant shall be permitted to install brand correct signs and displays in its windows, and the maximum amount of signage, company logos and banners on the façade of the Premises, subject to compliance with Laws and Landlord's consent.

C.      Any signs that Tenant maintains and displays inside the Premises, to the extent same are visible from the exterior of the Premises, shall be professionally prepared. Landlord shall have no right to approve any signage or advertising of any kind within the interior of the Premises, provided that all signage or advertising shall comply with all applicable Laws.

# ARTICLE XXVI
## MISCELLANEOUS

### Section 26.1    Partial Invalidity

If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstance other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term, covenant or condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.

### Section 26.2    Successors and Assigns

Except as otherwise provided herein, this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, executors, successors and assigns.

### Section 26.3    Waiver

The waiver by Landlord or Tenant of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition herein contained.  The subsequent acceptance of Base Rent or Additional Rent hereunder by Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such Base Rent or Additional Rent.  No covenant, term or condition of this Lease shall be deemed to have been waived by Landlord or Tenant, unless such waiver be in writing by Landlord or Tenant, as the case may be.

### Section 26.4    No Partnership

Landlord does not, in any way or for any purpose, become a partner, employer, principal, master, agent or joint venturer of or with Tenant.

### Section 26.5    Time Is Of The Essence

Time is of the essence of this Lease.

### Section 26.6    Broker's Commission

Tenant and Landlord warrant each to the other that they have had no dealings with any broker or agent in connection with this Lease except as designated in Section 1.15, and each party covenants to pay, hold harmless and indemnify the other from and against any and all costs expense or liability for any compensation, commissions and charges claimed by any broker or agent with respect to this Lease or the negotiation thereof.  Landlord shall pay a commission to Baum Realty Group pursuant to a separate written agreement, who will pay a commission to Michael Wexler of Mid-America Real Estate Corporation.

#3104972v10

**Section 26.7    Entire Agreement**

This Lease and the Exhibits attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Premises and there are no covenants, promises, agreements, conditions or understanding, either oral or written, between them other than as are herein set forth.   No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

**Section 26.8    Applicable Law**

The validity, performance and enforcement of this Lease shall be governed by the Laws of Illinois.  As used in this Lease, the term "Law" or "Laws" shall mean all present and future federal, state and local common law, statutes (including without limitation the ADA ([as hereafter defined]), as amended from time to time, rules, codes, ordinances and regulations, and all directions, requirements, rulings and orders of all federal, state and local courts and other governmental (and quasi-governmental) agencies and authorities including, without limitation, those of any health officer, fire marshal, building inspector or other officials, of the governmental agencies having jurisdiction.

**Section 26.9    Notices**

Whenever under this Lease provision is made for any demand, notice or declaration of any kind, or where it is deemed desirable or necessary by either party to give or serve any such notice, demand or declaration to the other party, it shall be in writing and may be sent by either party or their counsel or, in the case of Landlord, its managing agent, and sent either by (i) certified mail, return receipt requested, postage prepaid, or (ii) via an overnight carrier delivery (such as Federal Express or Airborne Express) to the address set forth in Section 1.14 hereof, or to such other address as may be given by a party to the other by proper notice hereunder.  The date the notice is delivered or refused shall be the date on which any notice hereunder shall be deemed given.

**Section 26.10  Quiet Enjoyment**

Tenant, on payment of the sums due hereunder and performance of all the covenants, conditions and provisions on Tenant's part to be observed and performed hereunder, shall peacefully and quietly have, hold and enjoy the Premises during the Term of this Lease and any extension or renewal hereof, subject, nevertheless, to the terms of this Lease.

**Section 26.11  Recording**

The parties shall not record this Lease, but upon the request of either party, a memorandum of this Lease may be recorded.

**Section 26.12  Execution of Lease**

The submission of this Lease for examination or signature does not constitute a reservation of or option for the Premises and this Lease shall become effective as a lease only upon full execution thereof by both Landlord and Tenant, and the delivery of same to each other.  This Lease

may be executed in multiple counterparts. All counterparts so executed shall constitute one agreement notwithstanding that all parties are not signatories to the original or to the same counterpart. Each counterpart shall be deemed an original of this Lease, all of which shall constitute one agreement to be valid as of the Effective Date, notwithstanding the actual date of delivery of such counterpart. Counterparts executed by electric signature and counterparts executed, scanned and transmitted by email or other electronic means shall be deemed original signatures for purposes of this Lease and all matters related hereto, which such scanned and electronic signatures having the same legal effect as original signatures.

### Section 26.13 Accord and Satisfaction

Landlord is entitled to accept, receive and cash or deposit any payment made by Tenant for any reason or purpose or in any amount whatsoever, and apply the same at Landlord's option to any obligation of Tenant and the same shall not constitute payment of any amount owed except that to which Landlord has applied the same. No endorsement or statement on any check or letter of Tenant shall be deemed an accord and satisfaction or otherwise recognized for any purpose whatsoever. The acceptance of any such check or payment shall be without prejudice to Landlord's right to recover any and all amounts owed by Tenant hereunder and Landlord's right to pursue any other available remedy.

### Section 26.14 Corporate Tenant

Tenant hereby covenants, represents and warrants that Tenant is a duly incorporated or duly qualified (if foreign) corporation and is authorized to do business and in good standing in the State where the Building is located, and that the person executing this Lease on behalf of Tenant is an officer of such Tenant, and is duly authorized to sign and execute this Lease.

### Section 26.15 Waiver of Jury Trial

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with the terms of this Lease. In the event Landlord commences any proceedings for nonpayment of any Rent, Tenant will not interpose any non-compulsory counterclaim in any such proceedings. This shall not, however, be construed as a waiver of the Tenant's right to assert such claims in any separate action or actions brought by the Tenant.

### Section 26.16 Default Rate

The "Default Rate" as used herein, shall mean three percent (3%) per annum in excess of the "Prime Rate" published in the Wall Street Journal, but in no event to exceed the maximum lawful rate.

### Section 26.17 No Presumption Against Drafter

Landlord and Tenant understand, agree and acknowledge that (i) this Lease has been freely negotiated by both parties; and (ii) in any controversy, dispute or contest over the meaning, interpretation, validity or enforceability of this Lease or any of its terms or conditions, there shall

#3104972v10

be no interference, presumption or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

### Section 26.18 Security

To the extent Landlord provides security to the Building or Common Areas, Landlord does not warrant the efficiency of any such security personnel, services, procedures or equipment. Landlord shall not be responsible or liable in any manner for failure of any security personnel, services, procedures or equipment to prevent or control or apprehend anyone suspected of personal injury or property damage in, on or around the Building.

### Section 26.19 Objection to Statements

Tenant shall have one (1) year from the receipt of any statement from Landlord including, by way of example and not by way of limitation, annual Real Estate Tax statements and annual Common Area Maintenance Charges statements, within which to object to the statement in whole or in part. Tenant waives any right it may have to dispute any statement after such one (1) year and waives any right to make any claims against Landlord for any errors not disputed within said one (1) year.

### Section 26.20 Reserved Areas

Landlord reserves all rights to use (or grant other parties the right to use) and Tenant shall have no right, title or interest in (i) the roof of the Building, (ii) the exterior non-storefront portions of the Premises, (iii) air rights above the Premises, (iv) air rights to the land and improvements below the floor level of the Premises except for the Basement Space, and the non-exclusive right to use Common Areas in the basement of the Building for Tenant's access to the Basement Space (v) areas within the Premises necessary for utilities, services, safety and operation of the Building that will not materially interfere with Tenant's use of the Premises, and (vi) those areas noted on the Site Plan which are "dedicated Landlord space" or to other first floor tenants.

### Section 26.21 Confidentiality

Landlord and Tenant hereby acknowledge that the transaction described in this Lease is of a confidential nature and shall not be disclosed except to consultants, investors, advisors, attorneys, brokers, accountants, governmental authorities in connection with the Building Permit, affiliates, or as required by Law. Unless such information is already known to the public, Landlord and Tenant covenant and agree not to make any public disclosure of the specific terms of this Lease, including, but not limited to, rent and charges due hereunder, or improvement allowances granted by Landlord, option periods, length of term or any other term or provision of this Lease, without the prior written consent of the other party, as may be required by Law or pursuant to an order of a court of competent jurisdiction; provided, however, either party may disclose the terms hereof to its lenders or prospective lenders or its respective accountants who audit its respective financial statements or prepare its respective tax returns, to any prospective permitted transferee of all or any portions of their respective interests hereunder (including a prospective assignee or subtenant of Tenant), any governmental entity, agency or person to whom disclosure is required by applicable Law and where ordered by a court to do so in connection with any action brought to enforce the terms of this Lease, on account of the breach or alleged breach hereof or to seek a

judicial determination of the rights or obligations of the parties hereunder. In any judicial or administrative action, the parties agree that they will consent to the entry of a protective order or placing the information under seal by the court or other tribunal so that the information may be protected from public disclosure to the maximum extent possible. In the event of the termination of this Lease for any reason whatsoever, Landlord and Tenant shall use their commercially reasonable efforts, including instructing its employees and others who have had access to the terms and provisions of this Lease, to keep same confidential. The provisions of this paragraph shall survive the termination of this Lease by lapse of time or otherwise. Notwithstanding the foregoing, once Landlord has signed this Lease and returned a fully executed original back to Tenant, Tenant may disclose the existence of this Lease and may make a public announcement solely of its tenancy in the Building, and upon such disclosure, this information shall no longer be deemed confidential.

Landlord shall not reference Tenant's name on any site plan, on Landlord's website, or in any "coming soon" signs or information or in any announcements about the Building, and Landlord shall not issue any press release or make any public announcement (including commentary to the news media) of same or of Tenant's potential tenancy at the Premises until Tenant has issued a press release announcing such opening, or Tenant or its agents otherwise make such information public. Any press release by Landlord shall be subject to Tenant's prior review and comments.

### Section 26.22   Lien Waiver.

Upon Tenant's delivery of the Building Permit to Landlord, Landlord shall execute and deliver to Tenant the Landlord Lien Waiver and Consent to Removal of Personal Property, in substantially the same form as attached hereto as Exhibit "L."

### [SIGNATURE PAGE SHALL FOLLOW]

**IN WITNESS WHEREOF**, the parties have subscribed their respective signatures in execution hereof, on the day and year written.

LANDLORD:

**MAROL STATE L.L.C.,** an Illinois limited liability company

By: _R W MAROL_____

Name: _Ralph MAROL_____

Its: _MANAGER_____

TENANT:

**EVERLANE, INC.,** a Delaware corporation

By:_____

Name:_____

Its:_____

50

**IN WITNESS WHEREOF**, the parties have subscribed their respective signatures in execution hereof, on the day and year written.

LANDLORD:

**MAROL STATE L.L.C.,** an Illinois limited liability company

By:_____
Name:_____
Its:_____


TENANT:

**EVERLANE, INC.,** a Delaware corporation

By:_____
Name:_____ Edgar Ho _____
Its:_____ CFO _____

51

# EXHIBIT A

# SITE PLAN



## EXHIBIT B

## RULES AND REGULATIONS

1.      Tenant shall have the non-exclusive right to use with other tenants or occupants of the Building the trash and loading yard ("Trash and Loading Yard") designated on Exhibit A, at any times permitted by Law for deliveries, loading, unloading of merchandise, supplies, furniture, equipment, or other property, to and from the Premises.  Landlord may relocate the loading area, provided that Landlord provides a reasonably similar loading area at the Real Property.  Subject to Laws, Tenant may allow the foregoing activities at any time (1) through the front doors of the Premises, or (2) from the streets and alleys adjacent to the Premises.  The cost to operate and maintain the Trash and Loading Yard shall be included in Expenses.

2.      Tenant shall have the non-exclusive right to use with other tenants or occupants of the Building the trash area within the Trash and Loading Yard ("Trash Area").  Landlord may relocate the trash area, provided that Landlord provides a reasonably similar trash area at the Real Property.  Garbage and refuse shall be covered and kept in the kind of container required by Law and shall be placed in the Trash Area, and but not be stored within the Premises, for collection at times reasonably determined by Landlord.  The cost to operate and to maintain the Trash Area, and remove garbage, refuse and recyclable items shall be included in the Expenses.

3.      No radio, television, phonograph or other similar devices, or aerial attached thereto (inside or outside) shall be installed without first obtaining in each instance Landlord's consent in writing, and if such consent is given, no such device shall be used in a manner so as to be heard or seen outside the Premises.

4.      Tenant shall not place, suffer or permit any obstructions or merchandise in the outside area immediately adjoining the Premises, including all sidewalks and public areas to the curb.

5.      Tenant shall not use the public or Common Areas for business purposes.

6.      Plumbing facilities shall not be used for any other purpose than that for which they are constructed, and no foreign substance of any kind shall be permitted therein.

7.      Tenant shall use reasonable efforts to keep the Premises free of pests and insects.

8.      Tenant shall not place, suffer or permit displays, decorations or shopping carts on the sidewalks adjacent to the Premises or on or about any of the Common Areas.

9.      Tenant shall keep the Premises' display windows illuminated and signs and lights at its storefront lighted during the hours that Tenant is open and operating for business.

10.      Tenant shall use reasonable and lawful efforts to protect the Premises from theft, robbery and pilferage, including, in Tenant's reasonable judgment, keeping non-customer doors locked and other means of entry to the Premises closed and secured during non-business hours, and Landlord and its members shall have no responsibility therefore.

11.     Tenant shall not permit any use, practice or condition which shall constitute a hindrance or danger to the safe and orderly flow of either pedestrian or vehicular traffic in the Common Areas and on the streets or alleys in the vicinity of the Building; if any strike, picket line, lockout, boycott or other visible activity objectionable to Landlord is conducted or carried out by or against Tenant, its contractors, subcontractors or any of their respective employees, on or about the Premises or the Building, Tenant shall take all lawful measures to immediately end same including, but not limited to, removing or causing the removal of all personnel therefrom whose presence on the Premises or in the Building is the cause giving rise to such strike, picket line, boycott or objectionable activity.

12.     Without the prior written consent of Landlord, Tenant shall not operate any coin or token operated vending machine or any device used for the sale of any goods, wares, merchandise, food, beverages or services including, but not limited to, pay telephones, pay lockers, pay toilets, scales, amusement devices and machines for the sale of beverages, food, candy, cigarettes or other commodities.  Landlord's prior written consent shall not be required for those machines and devices which are exclusively for use by employees of Tenant and which are not visible from the sales area or the exterior of the Premises.

13.     Tenant shall not make noises, cause disturbances or vibrations or use or operate any device that emits sound vibrations or disturbances, any of which may be objectionably offensive to Landlord or to other tenants and occupants of the Building or that would interfere with the reasonable operation of any tenant business or with the operation of any device or equipment or radio or television broadcasting or reception from or within the Building or elsewhere.

14.     Tenant shall not use the Premises in any other manner which could exceed the then existing load bearing capacity of the floor.

15.     Unless otherwise permitted by the Lease, Tenant shall not use the Premises, nor any part of the Building, nor permit its agents, employees or contractors to use the Premises, (i) for the manufacture, sale, barter, trade, gift or service of intoxicating liquors of any nature whatsoever, as the same shall be defined under the statutes of the United States, the State of Illinois, the City of Chicago, or other governmental authority having jurisdiction over the Premises, or (ii) for sell, purchase or give away, nor permit the sale, purchase or gift of, food in any form by or to any of Tenant's agents, employees, contractors, customers, guests, invitees, licensees on the Premises.  The foregoing shall not prohibit the service of food and beverages (including alcohol) at special events at the Premises, provided that Tenant shall obtain all necessary licenses and permits, and "dram shop" insurance on terms reasonably acceptable to Landlord, prior to such event.

16.     Tenant shall keep the Premises at a temperature sufficiently high to prevent freezing of water in pipes and fixtures.

17.     If there is an inconsistency between the terms of this Exhibit B and the terms of the Lease, the terms of the Lease shall control. Landlord shall have the right to amend the Rules and Regulations from time to time, in Landlord's reasonable determination.

**EXHIBIT C**

**GENERAL PROVISIONS FOR TENANT'S WORK**

1.      Tenant's Work shall be coordinated with the work being done by Landlord and/or other tenants of the Building to such degree that such Tenant Work will not interfere with or delay any work by any party and/or tenants at the Building.

2.      Tenant shall not allow any construction debris to be placed in or around the Building, except in the Premises.  Tenant, at Tenant's cost, shall remove any construction debris from the Premises and the Building.

3.      For any Tenant's Work on the sprinkler serving the entire Building, the fire alarm serving the entire Building or the roof, Tenant shall use Landlord's contractors in order to preserve existing warranties.

4.      Workmanship and Warranties.  All Tenant Work shall be performed in a first-class, workmanlike manner in accordance with all Laws, and shall be in good and usable condition at the date of completion thereof. Tenant shall require all contractors performing any Tenant Work to guarantee the same from any and all defects in workmanship and materials for one (1) year from the date of completion thereof.  Tenant shall be responsible for the replacement or repair, without additional charge, of any and all Tenant Work done or furnished by or through Tenant which shall become defective within one (1) year after substantial completion of the Tenant Work.   The correction of such Tenant Work shall include, without additional charge, all expenses and damages in connection with such removal, replacement or repair of any part of the Work which may be damaged or disturbed thereby.

5.      All warranties or guarantees of materials or workmanship on or with respect to any Tenant Work shall be written so that such guarantees or warranties shall inure to the benefit of both Landlord and Tenant.

6.      Landlord, if it so elects, may provide a list of general contractors or subcontractors that it deems unsuitable for use in the Building.  Other than those contractors to which Landlord has objected, Tenant shall have the right to select the general contractor and sub-contractors of its choice for Tenant's Work and shall identify such contractors and subcontractors to Landlord upon making such selection.  All contractors shall be licensed and insured in the jurisdiction in which the Premises are located.

7.      After Landlord's review and approval of the Tenant's plans pursuant to Section 6.3 of the Lease, any revisions, addition or cutting of the structure and/or the roof shall be designed by Tenant's structural engineer, shall be clearly identified on the plans and will be subject to Landlord's approval in accordance with the terms of Section 6.3 of the Lease.

8.      Tenant agrees to store building materials on that part of the Building reasonably designated by Landlord or within the Premises.  Tenant further agrees to require its contractor to

cause all construction access to the Building to be done at such access points as Landlord shall reasonably designate.

9.     Tenant acknowledges that the presence of its agents, contractors or employees on the Building while Tenant is causing Tenant's Work to be completed could interfere with and/or hinder (i) the businesses being operated by other tenants and occupants of the Building, and/or (ii) the performance of work by other tenants and/or contractors. Therefore, Tenant agrees to co-ordinate any activities of its employees, agents and contractors with Landlord. Tenant covenants and agrees that until Tenant's Work is completed, Tenant's construction activities shall not: (a) cause any increase in Landlord's cost to provided normal and customary services to the other tenants of the Building, (b) materially and adversely interfere with the use, occupancy or enjoyment of any part of the Building by any tenant or occupant thereof of which Tenant is aware, (c) cause the Building to be in violation of any law, rule, regulation, order or ordinance, or (d) cause any disruption of or interference with utility services utilized by the tenants or occupants of the Building.

10.     Prior to commencement of any Tenant's Work and until the later of completion thereof and the occurrence of the Commencement Date, Landlord, Tenant, the Tenant's general contractor (the "Tenant's GC"), and the Tenant's GC's subcontractors and Tenant's installers, vendors and subcontractors shall each effect, maintain, and provide the certificates of insurance policies for the following coverage:

a.     Builder's risk insurance to cover Landlord's architect and GC, Tenant's Architect (defined hereinafter), Landlord's agents and Tenant's GC, and if required by Landlord, Landlord's lender, as their interests may appear, against loss or damage by fire, vandalism and malicious mischief and such other risks as are customarily covered by a so called "extended coverage endorsement" upon all Tenant Work in place and all material stored at the Building and builder's machinery, tools and equipment, all while forming a part or contained in such improvements or temporary structures while at the Building, all to the full insurable value thereof at all times.

b.     Workman's Compensation Insurance in accordance with the laws of the State of Illinois including Employer's Liability Insurance to the limit of no less than $300,000.00.

c.     Commercial General Liability Insurance, excluding "Automobile Liability" against personal injury, including death resulting therefrom, to the limits of $1,000,000.00 for any one person and $2,000,000.00 for more than one person in any one accident, and against property damage to the limit of $150,000.00.

d.     Automobile Insurance, including "non-owned" automobiles, against personal injury, including death resulting therefrom to the limits of $500,000.00 for any one person and $1,000,000.00 for more than one person in any one accident, and against property damage to the limit of $150,000.00.

11.     Notwithstanding anything to the contrary, any work performed by Tenant, which is included in Section 6.2 and Exhibit "J" of this Lease shall be completed in accordance with the terms of this Exhibit C.

All insurance certificates shall name Landlord and Landlord's lender (Oak Bank), and if and to the extent that Tenant has received notice of the name and address of lender from Landlord, as additional insureds, for the coverages described in this Exhibit C.

Such certificates shall include the following statement:

> "The coverage afforded the Additional Insureds under this policy shall be primary insurance. If an Additional Insured has other insurance which is applicable to the loss, such other insurance shall be on an excess basis. The amount of the company's liability under this policy shall not be reduced by the existence of such other insurance."

Each contractor and subcontractor shall provide all required insurance certificates to Landlord prior to commencing work in the Premises.

**Protection of Work and Property**

1.     The Tenant's GC and subcontractors, vendors and installers, shall each continuously maintain adequate protection of all its work from damage and shall protect the Landlord's property from injury or loss arising in connection with such party's work. Such party shall promptly repair any such damage, injury or loss and shall adequately protect adjacent property as provided by applicable Law.

2.     Should the Tenant's subcontractor cause damage to any separate contractor, the Tenant's subcontractor shall agree, upon due notice, to settle with such contractor.

3.     Except as approved by Landlord in writing, neither Tenant's GC nor subcontractors shall make any attachments to or penetrations through the roof deck. All such penetration shall be made by a roofing contractor selected by Landlord and such penetrations shall be performed in a manner which is reasonable acceptable to Landlord and such roofing contractor.

4.     Clean Up. Tenant and Tenant's GC and subcontractors shall be responsible for keeping the Premises clean and in a workmanlike condition at all times.

5.     Basement Space. Tenant, at Tenant's sole cost and expense, shall be responsible for any work in connection with the improvement of the Basement Space. All work for the Basement Space shall be pre-approved in writing by Landlord, such approval not to be unreasonably withheld, conditioned or delayed. All work performed by Tenant or its contractors, subcontractors or agents shall be subject to the terms and conditions of this Lease.

6.     The Tenant and its contractors shall follow all construction guidelines imposed by Landlord's architect at the Building, including, but not limited to, the weight of equipment and materials on the floors, and floor penetrations.

**EXHIBIT D**

**TENANT'S SIGN CRITERIA**

**General Requirements:**

1.     Tenant must submit to Landlord for written approval, in accordance with the terms of Article XXV.B of the Lease, three copies of detailed drawings showing the sign in scale on the storefront (one submission in color sent via e-mail will be acceptable).  Drawings must include size, layout, colors, materials and mounting details of the proposed sign.

2.     Any sign installed on the storefront without prior Landlord approval (or deemed approval) or approval required by Law shall be removed from the Premises by Tenant at Tenant's sole cost and expense.

3.     Tenant shall obtain all permits and approvals for signs required by Law.

4.     All signs shall be constructed and installed by Tenant at Tenant's expense.

5.     All signs and their installation shall comply with all applicable Laws.

**Design Requirements:**

1.     No animated, flashing or audible signs or floodlight illumination will be permitted.

2.     All transformers, conduit and other equipment shall be concealed behind fascia.

3.     Painted lettering will not be permitted.

4.     All attaching bolts shall be of a non-corrosive metal, and all penetrations must be sealed or caulked to prevent the weather from entering the fascia.  All mounting components must be concealed.  Angle clips attached to letter sides will not be permitted.

5.     Each storefront sign shall be designed to be compatible in character and scale with the overall storefront concept as interpreted by Landlord.

6.     All signs shall consist of a single row signage centered over the Premises whenever possible.

7.     Signs may not encroach in top or bottom 1 foot of building facia on which they are located.

8.     Signs may be halo type illuminated signs (reverse channel letters) with neon or LED illumination.  LED colors (particularly white) must be reviewed by Landlord as part of Landlord's approval process pursuant to the terms of Article XXV.B of the Lease.

9.     Signs may be non-internally illuminated panel signs or individual pin mounted dimensional letters with accent lighting (letters or panel shall be 3" thick minimum).

10.    Decorative dimensional blade signs shall be reviewed by Landlord.

11.    Internally illuminated channel letters are prohibited.

## EXHIBIT E

## USE RESTRICTIONS

No part of the Premises shall be used for any of the following: cocktail lounge (except as incidental to a full service restaurant), bar (except as incidental to a full service restaurant), disco, bowling alley, pool hall, billiard parlor, skating rink, roller rink, amusement arcade (except a de minimis number of games are permitted as incidental to a full service restaurant), children's play or party facility, adult book store, adult theatre, adult amusement facility, a facility selling or displaying pornographic materials or having such displays, second hand store, odd lot, closeout or liquidation store, auction house, flea market, swap shop, educational or training facility (other than the incidental training of customers and employees), blood bank, sleeping quarters or lodging, the housing, treating, or raising of animals, the sale, leasing or storage of automobiles, boats or other vehicles, any industrial use, an assembly hall, off track betting establishment, bingo parlor, a health club, fitness center, spa or personal training studio, a day care center, church or other house or place of worship, reading room, funeral parlor or crematorium, a betting parlor, a gambling casino or gambling activities, tattoo parlor, massage parlor, modeling studio, business that cashes checks or makes short-term or "payday advance" type loans, coin operated laundry, drug or alcohol abuse treatment or counseling facilities, plasma center, or abortion clinic or counseling office, warehouse operations (provided this shall not prohibit Tenant from making to deliveries to individual customers from inventory in the Premises), any use involving the use, storage, disposal or handling of Hazardous Substances or underground storage tanks, any office use (except incidental to a retail use), a restaurant, the sale or distribution of marijuana or similar substances, a pawn shop, any use which creates a nuisance, or any use which is prohibited by Law.

Subject to Section 2.2, no part of the Premises shall be used for the display, or sale or rental of (i) eyewear, eyewear accessories and eyewear ancillary items, or for the performance of eye exams or other eye examinations; or (ii) luggage or travel goods.

**EXHIBIT F**

**INTENTIONALLY DELETED**

**EXHIBIT G**

**FORM OF SNDA**

**RECORDING REQUESTED BY**
AND WHEN RECORDED MAIL TO:

**SUBORDINATION, ATTORNMENT AND NON-DISTURBANCE AGREEMENT**

NOTICE: THIS SUBORDINATION, ATTORNMENT AND NON- DISTURBANCE AGREEMENT RESULTS IN YOUR LEASEHOLD INTEREST BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE LIEN OF SOME OTHER OR LATER SECURITY INSTRUMENT.

THIS SUBORDINATION, ATTORNMENT AND NON-DISTURBANCE AGREEMENT ("Agreement"), dated as of _____, 20__, between Oak Bank ("Beneficiary"), Marol State, LLC an Illinois limited liability company ("Owner") and _____, a Delaware corporation ("Tenant"), having as its address _____ is as follows:

Owner and Tenant have entered into that certain Lease dated _____, 2019, together with any amendments, modifications, renewals or extensions thereof ("Lease") pursuant to which Owner leased to Tenant and Tenant leased from Owner the premises more particularly described in the Lease ("Premises") and located on the real property described in Exhibit "A" attached hereto (the "Secured Property"). Owner has obtained financing for the Secured Property and has executed a promissory note in the principal amount of _____ Dollars ($_____) ("Note") in favor of Beneficiary, payment of which is secured by a Mortgage ("Mortgage") encumbering the Secured Property and an Assignment of Real Property Leases and Rents.

In order to induce Beneficiary to make the above-described loan to Owner and to establish certain safeguards and priorities with respect to their respective rights in connection with the Premises, Beneficiary has requested that Owner obtain certain warranties and agreements from Tenant as hereinafter set forth. In consideration of the mutual benefits accruing to the parties hereto, the receipt of which is hereby acknowledged, the parties agree as follows:

1. <u>Subordination</u>. The Lease is and at all times shall continue to be subject and subordinate to the Note and the lien of the Mortgage and to all advances made or to be made thereunder, and to any renewals, extensions, modifications or replacements thereof, unless Beneficiary has filed a notice subordinating the lien of its Mortgage to the Lease. Beneficiary specifically reserves the right to file such a notice at its sole election. Tenant shall not subordinate the Lease to any lien, claim, mortgage, deed of trust, or other encumbrance of any kind, except as provided in this paragraph, and any such other subordination shall be deemed a default under the Lease and this Agreement. Tenant agrees to execute and deliver to Beneficiary or to any party to whom Tenant

hereby agrees to attorn, in form and substance reasonably satisfactory to Tenant and such party, such other instrument as either shall request in order to effectuate the provisions of this Agreement.

2.  <u>Limitation on Liability</u>. Nothing herein contained shall impose any obligation upon Beneficiary to perform any of the obligations of Owner under the Lease unless and until Beneficiary shall become an owner or mortgagee in possession of the Premises, and Beneficiary shall have no personal liability to Tenant beyond Beneficiary's interest in the Secured Property.

3.  <u>Attornment</u>. In the event of a foreclosure or other acquisition of the Premises (including, without limitation, by deed in lieu of foreclosure), the Lease shall be recognized as a direct lease from the Beneficiary, the purchaser at the foreclosure sale, or any such subsequent owner (collectively referred to as "Purchaser"), except Purchaser shall not be (i) liable for any previous act or omission of Owner under the Lease; (ii) subject to any offset which shall theretofore have accrued to Tenant against Owner except as specifically get forth in Section 6.5 to the Lease; (iii) subject to any obligation with respect to any security deposit under the Lease unless such security deposit has been physically delivered to Purchaser; or (iv) bound by any previous modification or prepayment of rents or other sums due under the Lease greater than one month unless such modification or prepayment shall have been expressly approved in writing by Beneficiary, which approval shall not be unreasonably withheld.

4.  <u>Non-disturbance</u>. So long as no default exists (after notice, if any, required by the Lease) as would entitle Owner under the Lease to terminate the Lease or would cause, without any further action of Owner, the termination of the Lease or would entitle Owner to dispossess Tenant thereunder, the Lease shall not be terminated nor shall Tenant's use, possession, or enjoyment of the Premises be interfered with, nor shall the leasehold estate granted by the Lease be affected in any foreclosure, or in any action or proceeding instituted under or in connection with the Mortgage, nor shall Tenant be named or joined in any foreclosure proceeding unless applicable law requires Tenant to be made a party thereto and Lender shall recognize Tenant as the tenant of the Premises for the remainder of the term of the Lease in accordance with the provisions thereof.

5.  <u>Payment of Rent on Default</u>. Tenant acknowledges and agrees that the Lease has been assigned to Beneficiary by Owner as security for its obligations under, and secured by, the Note and Mortgage. Tenant agrees that, upon receipt of notice from Beneficiary that a default exists under the Note or Mortgage, or any instrument or document collateral thereto, Tenant shall make all rental and other payments required pursuant to the Lease, as directed by written instruction from Beneficiary. Tenant may make payments to Beneficiary directly in the event of such a default, for which written notice has been delivered to Tenant, and thereby be properly credited with an offset and credit for such payments as against the rental payments then due under the Lease.

Owner acknowledges and agrees that Beneficiary shall be entitled to collect and receive rents pursuant to the Lease as provided herein and Tenant is authorized and hereby directed to make all such payments of rent to Beneficiary upon receipt of the notice of default provided that Tenant shall be under no duty or obligation to make further inquiry. Tenant shall continue to make all such payments of rent to Beneficiary unless and until Tenant is otherwise authorized and directed in writing by Beneficiary.

6. <u>Further Documents</u>. Tenant shall execute and deliver to Beneficiary or to any party to whom Tenant hereby agrees to attorn, in form and substance reasonably satisfactory to Tenant and such party, such other instruments as either shall request in order to effectuate the provisions of this Agreement.

7. <u>Subordination</u>. Tenant declares, agrees and acknowledges that it intentionally and unconditionally subordinates the Lease and its leasehold interest in favor of the lien or charge upon the Secured Property of the Mortgage in favor of Beneficiary, subject to the terms of this Agreement.

8. <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors and assigns, and the holder from time to time of the Note.

9. <u>Attorneys' Fees</u>. If any legal action, arbitration or other proceeding is commenced to enforce any provision of this Agreement, the prevailing party shall be entitled to an award of its actual expenses, including without limitation, expert witness fees, actual attorneys' fees and disbursements.

10. <u>Notices</u>. All notices to Beneficiary shall be by certified mail to the address given at the top of page one of this Agreement. All notices to Tenant shall be by certified mail to the address given at the top of page one of this Agreement.

11. <u>Miscellaneous</u>. This Agreement may not be modified other than by an agreement in writing, signed by the parties hereto or by their respective successors in interest. Except as herein modified all of the terms and provisions of the Lease shall remain in full force and effect. In the event of a conflict between the Lease and this Agreement, the terms and provisions of this Agreement shall control. Nothing in this Agreement shall in any way impair or affect the lien created by the Mortgage or the other lien rights of Beneficiary.

12. <u>Counterparts.</u> This Agreement may be executed in counterparts which together shall constitute but one and the same original.

BENEFICIARY:

_____

By:_____

_____

OWNER:

**MAROL STATE, LLC**
a Illinois limited liability company


By:_____


TENANT:

_____, a Delaware corporation


By:_____

Its:_____

(ATTACH APPROPRIATE NOTARIAL FORM)

EXHIBIT A

DESCRIPTION OF SECURED PROPERTY

[To Be Attached]

## EXHIBIT H

## BASEMENT PLAN



**EXHIBIT I**
**INTENTIONALLY DELETED**

**EXHIBIT J**

**GROUND LEVEL LANDLORD WORK**

THIS EXHIBIT "J" IS ATTACHED FOR REFERENCE PURPOSES ONLY, AND SHALL NOT IMPOSE ANY DUTIES, OBLIGATIONS OR RESPONSIBILITIES UPON LANDLORD. ALL WORK DESCRIBED HEREIN WHICH IS NOT PRESENT IN THE PREMISES AS OF THE EFFECTIVE DATE SHALL BE PERFORMED BY TENANT, AT TENANT'S SOLE COST, IN ACCORDANCE WITH EXHIBIT "C."

Landlord shall deliver, at its sole cost and expense, the following work associated with the Ground Level Premises, in good and workmanlike condition, as described below and as more fully set forth in the Lease. Tenant shall not be required to accept possession of these Ground Level Premises until Tenant has inspected the Premises and found these Premises to be in substantial conformance with this Exhibit and the requirements of the Lease.

Certain work related elements that are Landlord's responsibility, but could not be completed during base building construction without precise Tenant specifications, are described in this Work Letter under the title "Tenant Improvement Reimbursable Costs". Landlord agrees to reimburse Tenant for expenditures related to such Tenant Improvement Reimbursable Costs completed during Tenant's Work. Tenant shall provide Landlord with all related construction expenses and associated back-up, the costs of which shall be within industry norms, subject to the advanced review and approval by Landlord prior to the commencement of work. Specific sections covered under the Tenant Improvement Reimbursable Cost include III.2.a (Interior Demising Partitions), lll.5.a (electrical conduit, electrical panel, and wiring from meter to panel), III.6.a (Telephone/Data conduit) I11.7.a (HVAC roof top unit), III.8.b (cold water line), and III.8.c (roof vent); refer to those sections for additional details.

I. Delivery of the Ground Level Premises

1. Landlord shall deliver code compliant Ground Level Premises accessible by the disabled and compliant according to the ADA and the applicable state and municipal laws, rules, and regulations, including all paths of travel. Landlord's compliance responsibility shall include, but not be limited to, applicable environmental, building code, zoning laws, rules and regulations pertaining to the design of the base building, in full force and effect at the time the plans and specifications were prepared, subject to the prevailing practices of the agencies having jurisdiction thereof.

2. Landlord shall deliver the Ground Level Premises, to the best of Landlord's knowledge, free and clear of any hazardous substances including, but not limited to, asbestos (encapsulated or not). Landlord shall provide Tenant a record of any such asbestos survey or equivalent documentation evidencing same.

3. During the period commencing on the Possession Date and ending upon the date of completion of Tenant's Work, Landlord shall provide the following services associated with Tenant's Ground Level Premises: a water source within 50 feet of the Premises, temporary lighting, and access to other temporary utilities, including but not limited to a minimum 100 amp electric service.

4. Landlord shall provide all permanent utilities servicing the base building, including but not limited to domestic water and fire sprinklers, sanitary sewer, gas, and electrical power as outlined herein. All meters and associated fees shall be the responsibility of Landlord, with the exception of the gas meter, which must be scheduled and installed by Tenant in order to establish an independent account. Meters shall be installed by Landlord in accordance with the terms of the Lease. There is a single water meter servicing the base building, and Landlord reserves the right to sub-meter water usage or require Tenant to pay for the cost of water as a pro-rated, reimbursable portion of the CAM expenses.

II. Except as otherwise provided in this Lease, or as otherwise agreed to by Landlord and Tenant, Landlord shall deliver the Ground Level Premises as a clean shell, free of any prior tenants' improvements, including but not limited to interior walls, floor finishes, utilities, ceilings, plumbing, electrical, HVAC ductwork, and any and all prior tenants' furniture, fixtures, machinery and equipment. Any existing, proposed, or future interior utility lines, conduit, pipes and ducts, installed by Landlord, or to be installed by Tenant within the Ground Level Premises, shall be located as tight as practical to the underside
of the structure above, at no lower than 14'-0" above finished floor level.
All
electrical/cabling shall be installed in hard pipe conduit and shall run parallel/perpendicular to the structure. No MC or flex conduit shall be installed.

III. Shell Construction Standards

1. Floor.
   a. Landlord shall provide a smooth, level at a single elevation, and clean concrete flooring system for the entire Ground Level Premises.

   b. Landlord shall be responsible for ensuring that the Ground Level flooring system is designed to meet the governing building code load requirements for retail use (100 PSF) and at the same relative elevation to the adjacent sidewalk. The interior floor elevation shall be no more than 1/2" above, but not lower, than the adjacent sidewalk.

   c. Tenant is authorized to penetrate the structural flooring system at location(s) to be approved by Landlord. Such approval is intended to verify any penetration is coordinated with the building's precast plank flooring system to ensure the structural integrity of the building remains intact. All cutting, coring and drilling of the existing Ground Level structural flooring system shall require concrete scanning with ground penetrating radar.

2. Partitions and Walls.
   a. Interior Demising Partitions — Any and all new demising partitions shall be designed and constructed as part of Tenant's Work, pending Landlord's approval of same. Landlord agrees to reimburse Tenant for the costs associated with said new Ground Level demising partitions included in Tenant 's Work, subject to the advanced review and approval by Landlord of detailed back-up supporting this expense and the usual and customary costs of same, as part of the Tenant Improvement Reimbursable Costs. Tenant to

extend all demising studs to the underside of structure above, with minimum 6", 20 gauge metal studs spaced at 24" O.C., and to include no less than 3" continuous sound batt insulation in the stud cavity. The exact locations of any and all new demising partitions are subject to approval by Landlord.

b. Landlord shall ensure the drywall on all existing interior demising partitions and exterior walls is true and plumb, finished to a level 4 finish, ready for paint. Tenant shall be responsible for painting such walls.

c. Landlord shall ensure all exterior walls are insulated with at least R11 insulation and/or as required by applicable Laws.

3. Ceiling.
   a. Ceilings will be exposed to the structure above throughout the entire Ground Level Premises. Landlord shall provide a minimum clear height of 16'-0" from the finished floor to the bottom of the building structure above.

4. Utilities.
   a. Landlord shall provide separate utility meters servicing Tenant's Ground Level Premises in accordance with the terms of the Lease, as previously defined in Section 1.4.

5. Electrical.
   a. Landlord shall install a 200A 3ph 120/208 electric service, connected to the metered location in the Lower Level Electric Room, in a location at the rear of Tenant's Ground Level Premises for future distribution by Tenant. Landlord agrees to reimburse Tenant for the costs associated with an electrical conduit extension to Tenant's Ground Level Premises, a wired connection from the Lower Level Electric Room to an electrical panel at the rear of Tenant's Ground Level Premises, as well as the cost of said electrical panel included as a part of Tenant's Work, subject to the advanced review and approval by Landlord of detailed back-up supporting this expense and the usual and customary costs of same, as part of the Tenant Improvement Reimbursable Costs.

6. Telephone/Data.
   a. Landlord shall install one (1) two-inch (2") empty conduit, with pull strings as required, from the Lower Level telecom board to a location at the rear of Tenant's Ground Level Premises for Tenant's telephone/data communication service. Landlord agrees to reimburse Tenant for the costs associated with the Telephone/Data conduit extension to Tenant's Ground Level Premises included as a part of Tenant's Work, subject to the advanced review and approval by Landlord of detailed back-up supporting this expense and the usual and customary costs of same, as part of the Tenant Improvement Reimbursable Costs.

7. Heating, Ventilation, Air-Conditioning.
   a. Landlord agrees to reimburse Tenant for the costs associated with the purchase and installation of a new high efficiency, gas heat, electric cool, fully-operational, HVAC rooftop unit per Tenant's specifications, with a capacity equivalent to one (1) ton per 250 SF for the Tenant's Ground Level Premises, included as a part of Tenant's Work, subject to the advanced review and approval by Landlord of detailed back-up supporting this expense and

the usual and customary costs of same, as part of the Tenant Improvement Reimbursable Costs. Additional heating/cooling capacity required at Tenant's Ground Level or Lower Level Premises shall be the responsibility of Tenant. Such rooftop unit shall be one of the following brands: Carrier, Lennox or other brand approved by Landlord. Landlord's reimbursement shall include the costs for all new power wiring, gas piping, thermostats, remote sensors, and smoke detectors integral to the rooftop unit, as well as the related roof penetration(s), curb construction and reroofing.

b. Tenant shall secure Landlord's approval for location of HVAC rooftop unit, which shall be placed directly above Tenant's Ground Level Premises.

c. The existing roof structural system has the capacity to support an HVAC rooftop unit load between the bar joists of up to 1,200 pounds. For loads exceeding this capacity, Tenant shall be responsible for the necessary structural improvements, subject to Landlord approval, and all costs associated with same.

8. Plumbing.

a. Sewer — Landlord shall provide a four-inch (4") sanitary sewer line suspended below the Ground Level structural flooring system. Tenant shall be responsible for penetration of the flooring system and for the tie-in to the sewer line, if so required. Landlord warrants that the existing sewer line is in good working order and free of obstructions.

b. Water — Landlord shall provide a one and a half-inch (1.5") diameter cold water line, valved and capped as required, to a location at the rear of Tenant's Ground Level Premises for future connection and distribution by Tenant. Landlord agrees to reimburse Tenant for the costs associated with the extension of the cold water line to Tenant's Ground Level Premises included as a part of Tenant's Work, subject to the advanced review and approval by Landlord of detailed backup supporting this expense and the usual and customary costs of same, as part of the Tenant Improvement Reimbursable Costs.

c. Vent Connections Points — Landlord agrees to reimburse Tenant for the costs associated with (1) one vent connection through the roof included as a part of Tenant's Work, subject to the advanced review and approval by Landlord of detailed back-up supporting this expense and the usual and customary costs of same, as part of the Tenant Improvement Reimbursable Costs. The location of the vent penetration shall be subject to Landlord's approval.

9. Storefront.

a. Tenant shall furnish and install a complete storefront infill assembly for the Ground Level Premises, the design of which is subject to Landlord's approval.

b. In the event the Premises requires a recessed, out-swinging entry door within the storefront infill portion to accommodate egress per applicable Law, Tenant shall be responsible for all waterproofing and insulation of the exposed flooring system as required to maintain water control and thermal continuity of the building's exterior envelope. Details of waterproofing and insulation shall be submitted to Landlord in accordance with, and shall be subject to, the terms of the Lease, including without limitation the concept of deemed approval.

    c. Second means of egress — Landlord shall allocate an existing exit door to serve as a second means of egress for Tenant's Ground Level Premises, if so required by Tenant's Work. The size and configuration of said egress door shall be compliant with all applicable Laws, including without limitation the ADA.

10. Structure.
    a. Landlord shall ensure that the existing structure, in both the Ground Level Premises and the dependent structure, is structurally sound and meets all applicable and governing Law with respect to structure.

    b. Any modifications to the existing structure required to maintain compliance with Law, shall be performed by Landlord at its sole cost and expense prior to the

    Possession Date, unless an alternative schedule is mutually agreed upon by Landlord and Tenant in writing.

    c. Tenant shall be responsible for all structural penetrations, improvements or reinforcement to the Premises which arise from Tenant's modification of the existing structural elements of the building. Any modification of the existing structural elements shall be submitted to Landlord in accordance with, and shall be subject to, the terms of the Lease, including without limitation the concept of deemed approval.

    d. Any and all cutting, coring and drilling of the existing Ground Level structural system will require concrete scanning with ground penetrating radar to protect the rebar and post-tension cables during construction, subject to review and approval of Landlord.

    e. All roof penetrations and locations must be approved by Landlord.

    f. Tenant shall provide a letter from the existing roofing manufacturer (Firestone Red Shield 20 Year Limited Warranty - #R0104091) that all work related to new roof penetrations will maintain the existing roofing warranty.

11. Fire Requirements and Life Safety Systems.
    a. Scope — Landlord shall deliver the Ground Level Premises in compliance with all applicable Laws regarding fire separation, fire rated construction, and/or fireproofing as required. Tenant shall be responsible for any additional fire resistive elements within the Ground Level Premises which arise from Tenant's modification of the Ground Level Premises delivered to Tenant on the Possession Date.

    b. Structural Member Fireproofing — Landlord shall ensure that structural members within the Ground Level Premises are fire-treated as required by the governing jurisdiction with respect to the building fire rating and use requirements.

    c. Fire Sprinklers System — Landlord shall provide a complete and tested sprinkler system per code, with upturned heads in the Ground Level Premises, ready for modification by Tenant during the performance of Tenant's Work. Said fire sprinkler system includes, but is not limited to, the provision and installation of all supply, controls, flow and tamper devices, and any backflow preventers and monitoring devices.

    d. Fire Alarm System — In a location as approved by the Chicago Fire

Department, Landlord shall install a base building Fire Alarm System including but not limited to, FACP and/or FAAP as required to provide the infrastructure necessary to
support Tenant's interior build-out. Tenant shall be responsible for the installation of any devices required solely as a result of Tenant's Work. In the event Landlord is required by the Chicago Fire Department to install any base building fire alarm devices within Tenant's Ground Level remises, Landlord shall obtain approval from Tenant for the location of said devices, subject to the requirements of the Chicago Fire Department.

### LOWER LEVEL LANDLORD WORK

THIS EXHIBIT "J" IS ATTACHED FOR REFERENCE PURPOSES ONLY, AND SHALL NOT IMPOSE ANY DUTIES, OBLIGATIONS OR RESPONSIBILITIES UPON LANDLORD. ALL WORK DESCRIBED HEREIN WHICH IS NOT PRESENT IN THE PREMISES AS OF THE EFFECTIVE DATE SHALL BE PERFORMED BY TENANT, AT TENANT'S SOLE COST, IN ACCORDANCE WITH EXHIBIT "C."

The current Lower Level and the associated utilities are designed for inactive storage use only. Any Tenant utilizing the Lower Level for inactive storage may locate their Lower Level Premises anywhere within the available designated storage areas, subject to Landlord's approval. Should Tenant wish to utilize the Lower Level for a more intensive use, Tenant is responsible for extending all necessary services from their Ground Level Premises as required to make their Lower Level Premises habitable, including any structural openings and any incremental cost increases associated with upsizing equipment or utility services beyond the level provided by Landlord. As such, the Lower Level Premises must be located in whole, or substantially in part, beneath the footprint of Tenant's Ground Level Premises above to facilitate these utility connections.

Notwithstanding the above, Landlord shall deliver, at its sole cost and expense, the following work associated with the Lower Level Premises, regardless of Tenant's intended use of said Premises, in good and workmanlike condition, as described below and as more fully set forth in the Lease. Tenant shall not be required to accept possession of these Lower Level Premises until Tenant has inspected the Premises and found these Premises to be in substantial conformance with this Exhibit and the requirements of the Lease.

Certain work related elements that are Landlord's responsibility, but could not be completed during base building construction without precise Tenant specifications, are described in this Work Letter under the title "Tenant Improvement Reimbursable Costs". Landlord agrees to reimburse Tenant for expenditures related to such Tenant Improvement Reimbursable Costs completed during Tenant's Work. Tenant shall provide Landlord with all related construction expenses and associated back-up, the costs of which shall be within industry norms, subject to the advanced review and approval by Landlord prior to the commencement of work. The specific section covered under the Tenant Improvement Reimbursable Cost includes TTT.2.a (Interior Demising Partitions); refer to that section for additional details.

IV. Delivery of the Lower Level Premises

1. Landlord shall deliver code compliance Lower Level Premises, accessible by the disabled and compliant according to the ADA and the applicable state and municipal laws, rules and regulations, including all paths of travel. Landlord's compliance responsibility shall include, but not be limited to, applicable environmental, building code, zoning laws, rules and regulations pertaining to the design of the base building, in full force and effect at the time the plans and specifications were prepared, subject to the prevailing practices of the agencies having jurisdiction thereof.

2. Landlord shall deliver the Lower Level Premises, to the best of Landlord's knowledge, free and clear of any hazardous substances including, but not limited to, asbestos (encapsulated or not). Landlord shall provide Tenant a record of any such asbestos survey or equivalent documentation evidencing same.

3. During the period commencing on the Possession Date and ending upon the date of completion of Tenant's Work, Landlord shall provide the following services associated with Tenant's Lower Level Premises: a water source within 50 feet of the Premises, temporary lighting, and access to other temporary utilities, including but not limited to a minimum 100 amp electric service.

**EXHIBIT K**

**TENANT LOGOS, COLORS FONTS, TRADEMARKS AND LETTERING**





EXTERIOR OVERHEAD ID SIGN FINAL ARTWORK



See 'Final Artwork' folder:

EXTERIOR OVERHEAD ID-OPTION 1
EXTERIOR OPTION 1.eps

EXTERIOR OVERHEAD ID-OPTION 2
EXTERIOR OPTION 2.eps





EVERLANE + PROJECT PROJECTS                    STORE SIGNAGE CONSTRUCTION DOCUMENTS                    08-08-2017                    12

**EXTERIOR PEDESTRIAN STREET NUMBER & LOGO FINAL ARTWORK**

**461**

**EVERLANE**

See 'Final Artwork' folder:

**EXTERIOR PEDESTRIAN STREET NUMBER.eps**

See 'Final Artwork' folder:

**EXTERIOR PEDESTRIAN LOGO.eps**



**EXTERIOR ENTRANCE DOOR VINYL GRAPHICS FINAL ARTWORK**

# E V E R L A N E

11—8  Monday—Friday
11—6  Saturday
12—5  Sunday

**See 'Final Artwork' folder:**

EXTERIOR DOOR VINYL LOGO.eps

**See 'Final Artwork' folder:**

EXTERIOR DOOR VINYL HOURS.eps





**EXTERIOR FLAG MOUNTED BANNER FINAL ARTWORK**

**See 'Final Artwork' folder:**

**EXTERIOR FLAG BANNER.eps**

**EXHIBIT L**

**LANDLORD'S LIEN WAIVER**
**LANDLORD LIEN WAIVER AND CONSENT TO REMOVAL OF PERSONAL PROPERTY**

(a)     The undersigned ("Landlord") has an interest in the real property shown on Exhibit "A" hereto annexed and made part hereof containing approximately _____ square feet of floor area and approximately forty (40) feet of frontage in the building shown on said Exhibit "A", which is part of _____ (the "Real Property").

(b)     Everlane, Inc., a Delaware corporation ("Borrower"), whose address is 2170 Folsom Street, San Francisco, California 24110, has entered into a Third Amended and Restated Loan and Security Agreement with Silicon Valley Bank ("Bank") dated as of April 3, 2018 (as amended, restated, or otherwise modified from time to time, the "Loan Agreement"). As a condition to entering into the Loan Agreement, Bank requires that Landlord consent to the removal by Bank of the personal property serving as collateral for Borrower's obligations to Bank under the Loan Agreement (hereinafter called "Collateral") from the Real Property. For purposes of this Agreement, the term "Collateral" shall exclude any of Borrower's personal property which is attached to the Real Property in such a manner that it constitutes a "fixture" as defined in the Uniform Commercial Code.

NOW, THEREFORE, Landlord consents to the placing of the Collateral on the Real Property, and agrees with Bank as follows:

1.     Landlord subordinates to Bank's security interest in the Collateral any and all of Landlord's claims, demands and liens of every kind and nature against the Collateral under applicable law or by virtue of the lease for the Real Property now in effect (the "Lease"), to levy or distrain upon for rent, in arrears, in advance or both, or to claim or assert title to the Collateral that is located on the Real Property and Landlord shall not assert such claims or demands until all of Borrower's obligations to Bank under the Loan Agreement have been paid in full.

2.     The Collateral shall be considered to be personal property and shall not be considered part of the Real Property unless it becomes attached or affixed to the Real Property. Landlord shall provide prompt written notice to Bank of any early termination or expiration of the Lease or any abandonment of the Real Property by Borrower.

3.     So long as Borrower remains in possession of the Real Property, Landlord will not dispose of any of the Collateral nor assert any right or interest therein. If any Collateral remains on the Real Property after Borrower has vacated the Real Property (whether upon early termination or expiration of the Lease or abandonment of the Real Property or otherwise), Landlord (i) will not dispose of any of the Collateral nor assert any right or interest therein unless Bank has had a reasonable period of time (in any case, not less than 30 days after Bank has knowledge that Borrower has vacated the Real Property) to exercise Bank's rights in and to the Collateral, and (ii) will permit Bank, or its agents or representatives, upon two business days' prior written notice by Bank to Landlord, to enter upon the Real Property during normal business hours

during such 30 day period for the purpose of exercising any right Bank may have under the terms of the Loan Agreement, at law, or in equity, including, without limitation, the right to remove the Collateral to inspect or remove the Collateral, or any part thereof, from the Real Property (but for no other purpose).

If any order or injunction is issued or stay granted which prohibits Bank from exercising any of its rights hereunder, then, at Bank's option, the period set forth in this Section 3 shall be stayed during the period of such prohibition and shall continue thereafter for the greater of (x) the number of days remaining for Bank to perform under this Section 3 or (y) 30 days.

In the event that Bank, or its agents or representatives, enter upon the Real Property to exercise Bank's rights with respect to the Collateral, Bank shall pay a pro-rated per diem fee at a rate equal to the base rental rate payable by Borrower under the Lease prior to the expiration or early termination of thereof (or Borrower's abandonment of the Real Property) for the number of days that Bank, or such agents or representatives, occupy the Real Property; provided that, notwithstanding anything to the contrary, in no event shall Bank or its agents, representatives or affiliates be liable for any rent or other fees or amounts that may be owing by Borrower to Landlord. Landlord and Borrower acknowledge that Bank's entrance upon, occupation and use of the Real Property as contemplated herein shall neither render Bank a tenant of landlord or sub-tenant of Borrower nor give rise to any obligations under the Lease or otherwise other than as set forth herein.

4.      Bank and Borrower agree, jointly and severally, promptly to repair any damage to the Real Property caused by Bank's or its agent's or representative's removal of the Collateral or, if Landlord, in its sole discretion, shall elect to make such repairs, to pay to Landlord promptly the reasonable and documented costs and expenses incurred in connection therewith. Bank hereby indemnifies Landlord for any claim, liability or expense (including reasonable and documented attorneys' fees) arising out of or in connection with Bank's or its agent's or representative's entry upon the Real Property and removal of the Collateral. Notwithstanding the foregoing, Bank shall not (a) be liable for any diminution in value of the Real Property caused by the absence of any Collateral so removed, and (b) have any duty or obligation to remove or dispose of any Collateral or any other property left on the Real Property by Borrower.

5.      This Agreement shall be governed by and construed in accordance with the laws of the State in which the Real Property is located.

6.      This agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and assigns of the respective parties hereto.

[Signatures included on the following page]

IN WITNESS WHEREOF, the undersigned have executed this instrument this ___ day of _____, 2019.

**LANDLORD**                                **SILICON VALLEY BANK**


By: _____         By: _____
Name:                                      Name:
Title:                                     Title:



Acknowledged and agreed:

**EVERLANE, INC.**

By:_____
Name:
Title:

EXHIBIT "A"

SITE PLAN